## NEW JERSEY *v.* CITY OF NEW YORK.

No. 17, original.    Argued April 30, 1931.—Decided May 18, 1931.

*Mr. Duane E. Minard,* Assistant Attorney General of New Jersey, with whom Mr. William A. Stevens, Attorney General, was on the brief, for plaintiff.

*Mr. Arthur J. W. Hilly,* Corporation Counsel of the City of New York, with whom *Messrs. Elliot S. Benedict, J. Joseph Lilly,* and *Thomas W. A. Crowe* were on the brief, for defendant.

474

475

MR. JUSTICE BUTLER delivered the opinion of the Court.

New Jersey invokes our original jurisdiction under § 2, Art. III of the Constitution.

The complaint alleges that the City of New York for many years has dumped and still is dumping noxious, offensive and injurious materials—all of which are for brevity called garbage—into the ocean; that great quantities of the same, moving on or near the surface of the water, frequently have been and are being cast upon the beaches belonging to the State, its municipalities and its citizens, thereby creating a public nuisance and causing great and irreparable injury. It prays an injunction re-

straining the City from dumping garbage into the ocean or waters of the United States off the coast of New Jersey and from otherwise polluting its waters and beaches.

Defendant by its amended answer denies the allegations that constitute the gravamen of the complaint.

For a first defense it states that for many years it has dumped garbage into the Atlantic Ocean under the supervision of the supervisor of the harbor of New York and in accordance with permits issued by him under the Act of June 29, 1888 (33 U. S. C., §§ 441, 443, 449 and 451) at points about 8, 12 and 20 miles southeast from the Scotland Lightship and about 10, 12½ and 22 miles respectively from the New Jersey shore and not in the waters of New Jersey or of the United States, and that in view of these facts the Court has no authority to enjoin it from so dumping garbage.

And for a second defense it alleges that for many years garbage in large quantities has been and is being dumped by others inside and outside the entrance of the harbor and at various places from 2½ to 8 miles from the New Jersey shore and at other places from 3 to 25 miles southeast of Scotland Light, that this material would float upon the New Jersey beaches alleged to have been polluted, that it is impossible to determine whether garbage dumped by defendant is carried to such beaches, and that, if any injury or damage is suffered by New Jersey, its municipalities or citizens, the injury is not chargeable to defendant.

And for a third defense it alleges that the complaint fails to state facts sufficient to entitle plaintiff to any relief.

The Court appointed Edward K. Campbell as Special Master and authorized him to take and report the evidence together with his findings of fact, conclusions of law and recommendations for a decree. The Master filed his report and the evidence introduced by the parties. It sets forth his findings, conclusions, and recommendations.

The substance of the findings of facts follows:

New Jersey borders on the Atlantic for about 100 miles. The shore principally involved extends from Atlantic Highlands southerly 50 miles to Beach Haven. On this stretch of shore, there are 29 municipalities. The State has conveyed or leased portions of the frontage to municipalities and individuals. It still owns 285,000 lineal feet between Sea Bright and Beach Haven. Municipalities have about 13,000 lineal feet and private parties the rest. The assessed value of property within these municipalities exceeds $139,000,000, and their population is more than 160,000. They are summer resorts, and the number of summer visitors is many times greater than their population. The beaches are gently sloping and wide and have been improved at great expense. The ocean and bathing, fishing and boating are the principal attractions. Inhabitants of the municipalities chiefly depend for their livelihood upon the business of maintaining these summer resorts. Approximately 500 persons are engaged in the operation of fish pounds constructed under authority of the State within three nautical miles from the coastline. This is a commercial activity that results in the taking of large quantities of fish annually.

Vast amounts of garbage are cast on the beaches by the waters of the ocean and extend in piles and windrows along them. These deposits are unsightly and noxious, constitute a menace to public health and tend to reduce property values. Prompt removal is necessary, and men are regularly employed to haul them away. At times there are 50 truckloads deposited on a single beach. When garbage is carried upon the shore the adjacent waters hold large quantities in suspension. Floating garbage makes bathing impracticable, frequently tears and damages fish pound nets and injuriously affects the business of fishing. Usually the sea along the shore clears within a few days

and sometimes within a single day. The deposits generally occur when the winds are from the east or northeast, but sometimes southeast winds bring them in. The heavier deposits occur four or five times in a season and frequently throughout the year, varying in number on different beaches.

For about 20 years prior to 1918 defendant disposed of its garbage by a reduction system and, except for a brief period in 1906, did not dump any at sea. A plant was destroyed by fire in 1917 and a contractor failed. It then applied to the supervisor of the harbor for permission to dispose of its garbage at sea and, because of the conditions then existing, he gave such permission and designated a dumping place. But later, because of complaint from New Jersey beaches, he designated the areas specified in defendant's answer. The defendant has installed and uses some incinerating plants but, by reason of increasing population and volume of garbage, the quantities still being dumped at sea are very large.

Weather permitting, the City dumps garbage daily. Less is dumped in the winter than in the summer. In February, 1929, the quantity was 52,000 cubic yards, while in June of the same year it was 192,000. When dumped, the mass forms piles about a foot above the water, spreads over the surface and breaks into large areas. Some materials remain on the surface and others are held in suspension. These masses float for indefinite periods and have been found to move at the rate of more than a mile per hour. Areas of garbage have been seen between the dumping places and the New Jersey beaches, and some have been followed from the place where dumped to the shore. In his report to the chief of engineers for 1918 and in each of his subsequent annual reports the supervisor of the harbor of New York stated that garbage deposited in the sea, no matter what the distance from the shore, is liable to wash up on the beaches.

The Master concluded that large parts of these floating and submerged areas of garbage, dumped by the defendant, are driven and carried by winds and water to and upon the shores of the plaintiff, and constitute the objectionable materials thereon and in the adjacent water.

In 1907 a committee appointed by the mayor reported to him: "All of the refuse collections could be dumped into the Atlantic ocean, but unfortunately the least harmful material sinks and the foulest floats, so that much of the floatable mass will be scattered along beaches through the action of current and wind. This fouling of beaches creates a nuisance that the public should not be asked to tolerate." In June, 1921, a committee composed of heads of departments and officials of the City reported to the mayor: "Aside, however, from the question of cost it seems undesirable to dump garbage at sea as it is being done at present. It is known that the Federal authorities quietly resent, if they do not openly object to it, and there is always the possibility of objections from other communities which have in the past claimed that they have been injured by the practice. When these objections become sufficiently strong it may be that New York will find itself so unprepared as to be unable to quickly introduce a more satisfactory form of disposal." The defendant, through its mayor and other representatives, has for years been informed that the dumping of its garbage is undesirable, and that other municipalities by the sea have suffered injury as the result of such dumping. Governors and the legislature of New Jersey have repeatedly complained to defendant. In 1929 the City had 20 incinerators and considerable garbage is being destroyed by them. In December of that year the department of sanitation presented to the mayor a program for increasing the number. The cause of the delay in providing an adequate disposal system was not shown.

The Master concluded that the method of disposing of garbage by dumping at sea was not an approved or a good system and disposition of such material by incineration or the "reduction system" was a proper way to dispose of the same. He found that the delay of defendant in adopting a proper method of disposal had been unreasonably long.

The Master found that whatever garbage reaches the plaintiff's shores from vessels and other dumpings than those of the defendant was negligible in comparison with that constantly being dumped by the defendant.

As his conclusions of law, the Master reports that the defendant has created and continues to create a public nuisance on the property of New Jersey and that the latter is entitled to relief in accordance with the prayer of its complaint, but that defendant should be given reasonable time within which to put into operation sufficient incinerators. He recommends that decree be entered accordingly.

The plaintiff filed no exceptions to the Master's report. The defendant excepted to substantially all material findings and conclusions. The Court has heard the arguments of counsel for the respective parties and considered their briefs for and against the exceptions and upon final submission of the case. The evidence abundantly sustains the findings of fact.

The defendant maintains that the Master erred in concluding that it has unnecessarily delayed providing incinerators. The record shows that garbage gathered in the Boroughs of Queens and Richmond has not been dumped at sea. The quantities shown to have been so dumped were taken from the Boroughs of Manhattan, Bronx and Brooklyn. The amounts collected, the amounts dumped and the percentage that the latter are of the former for the years 1924 to 1929 inclusive were shown in the evidence

and are indicated in the margin.\*   While such percentages have substantially decreased, the diminution of quantities actually dumped has been relatively slight.

Further discussion of the evidence would serve no useful purpose.   It is enough to say that defendant has suggested no adequate reason for disturbing the findings. They are approved and adopted by the Court.

Defendant contends that, as it dumps the garbage into the ocean and not within the waters of the United States or of New Jersey, this Court is without jurisdiction to grant the injunction.   But the defendant is before the Court and the property of plaintiff and its citizens that is alleged to have been injured by such dumping is within the Court's territorial jurisdiction.   The situs of the acts creating the nuisance, whether within or without the United States, is of no importance.   Plaintiff seeks a decree in personam to prevent them in the future.   The Court has jurisdiction.   Cf. *Massie* v. *Watts,* 6 Cranch 148, 158 *et seq.*   *Hart* v. *Sansom,* 110 U. S. 151, 154.   *Cole* v. *Cunningham,* 133 U. S. 107, 116.   *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 622–623.

There is no merit in defendant's contention, suggested in its amended answer, that compliance with the supervisor's permits in respect of places designated for dumping of its garbage leaves the Court without jurisdiction to grant the injunction prayed and relieves defendant in respect of the nuisance resulting from the dumping. There is nothing in the Act that purports to give to one

| *Year | Amount collected (from 3 boroughs only), cu. yds. | Amount Dumped at Sea | Approximate Percentage |
|---|---|---|---|
| 1924 | 1,837,970 | 1,675,657 | .91 |
| 1925 | 1,812,251 | 1,517,934 | .83 2/10 |
| 1926 | 1,869,752 | 1,303,119 | .69 6/10 |
| 1927 | 1,782,299 | 1,219,416 | .68 4/10 |
| 1928 | 1,955,818 | 1,378,572 | .70 |
| 1929 | 2,519,758 | 1,478,165 | .58 7/10 |

dumping at places permitted by the supervisor immunity from liability for damage or injury thereby caused to others or to deprive one suffering injury by reason of such dumping of relief that he otherwise would be entitled to have. There is no reason why it should be given that effect.

The Master's conclusions of law and recommendations for a decree are approved.

A decree will be entered declaring that the plaintiff, the State of New Jersey, is entitled to an injunction as prayed in the complaint, but that before injunction shall issue a reasonable time will be accorded to the defendant, the City of New York, within which to carry into effect its proposed plan for the erection and operation of incinerators to destroy the materials such as are now being dumped by it at sea or to provide other means to be approved by the decree for the disposal of such materials. And, in as much as the evidence does not disclose what is such reasonable time the case is referred to the same Special Master for findings of fact upon that subject. He is authorized and directed to hear witnesses presented by each of the parties, and, should he deem it necessary so to do, to call witnesses of his own selection and then with all convenient speed to report to the Court his findings and a form of decree.

*It is so ordered.*