# UNITED STATES v. FIRST NATIONAL CITY BANK.

No. 59. Argued November 16, 1964.—Decided January 18, 1965.

*Assistant Attorney General Oberdorfer* argued the cause for the United States. With him on the briefs were *Solicitor General Cox* and *Harold C. Wilkenfeld.*

*Henry Harfield* argued the cause for respondent. With him on the brief were *William Harvey Reeves* and *John E. Hoffman, Jr.*

*Roy C. Haberkern, Jr.,* and *Edward J. Ross* filed a brief for the Chase Manhattan Bank et al., as *amici curiae,* urging affirmance.

*Theodore Tannenwald* and *A. Chauncey Newlin* filed a memorandum for Omar, S. A.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case presents a collateral phase of litigation involving jeopardy assessments of some $19,000,000 made by the Commissioner of Internal Revenue against Omar, S. A., a Uruguayan corporation. The assessments charged that income had been realized within the United States on which a tax was due. On the same day respondent was served with notice of levy and notice of the federal tax lien. At the same time petitioner commenced an action in the New York District Court naming Omar, as well as respondent and others, as defendants. Personal jurisdiction over respondent was acquired; but as of the date of argument of the case here, Omar had not yet been served. That action requested, *inter alia,* foreclosure of

the tax lien upon all of Omar's property, including sums held for the account or credit of Omar in foreign branch offices of respondent.[1] It also requested that, pending determination of the action, respondent be enjoined from transferring any property or rights to property held for the account of Omar; and affidavits filed with the complaint averred that Omar was removing its assets from the United States.

The District Court, on the basis of the affidavits, issued a temporary injunction enjoining respondent from transferring any property or rights to property of Omar now held by it or by any branch offices within or without the United States, indicating it would modify the order should compliance be shown to violate foreign law. 210 F. Supp. 773. The Court of Appeals reversed by a divided vote both by a panel of three, 321 F. 2d 14, and *en banc,* 325 F. 2d 1020. The case is here on a writ of certiorari. 377 U. S. 951.

Title 26 U. S. C. § 7402 (a) gives the District Court power to grant injunctions "necessary or appropriate for the enforcement of the internal revenue laws." Since it has personal jurisdiction over respondent, has it power to grant the interim relief requested? We are advised that respondent's only debt to Omar is payable at respondent's branch in Montevideo. It is said that the United States, the creditor, can assert against respondent in New York only those rights that Omar, the debtor, has against respondent in New York and that under New York law a depositor in a foreign branch has an action against the head office only where there has been a demand and wrongful refusal at the foreign branch. *Sokoloff* v. *National City Bank,* 239 N. Y. 158, 145 N. E. 917, 250

---

[1] These branches are not separate corporations but parts of respondent's single, federally chartered corporation. See 12 U. S. C. §§ 601–604; *First National City Bank* v. *Internal Revenue Service,* 271 F. 2d 616.

N. Y. 69, 164 N. E. 745. The point is emphasized by the argument that any obligation of respondent to Omar is due only in Montevideo—an obligation apparently dischargeable in Uruguayan currency, not in dollars. Therefore, the argument runs, there is no claim of the debtor (Omar) in New York which the creditor can reach.

We need not consider at this juncture all the refinements of that reasoning. For the narrow issue for us is whether the creditor (the United States) may by injunction *pendente lite* protect whatever rights the debtor (Omar) may have against respondent who is before the court on personal service. If it were clear that the debtor (Omar) were beyond reach of the District Court so far as personal service is concerned, we would have quite a different case—one on which we intimate no opinion. But under § 302 (a) of the New York Civil Practice Law and Rules, 7B McKinney's Consol. Laws Ann., § 302, personal jurisdiction may be exercised over a "non-domiciliary" who "transacts any business within the state" as to a cause of action arising out of such transaction, in which event out-of-state personal service may be made as provided in § 313.[2] The Federal Rules of Civil Procedure by Rule 4 (e) and Rule 4 (f) allow a party not an inhabitant of the State or found therein to be served with a summons in a federal court in the manner and under the circumstances prescribed by a state statute.[3] See *United States* v. *Montreal Trust Co.*, 35 F. R. D. 216.

[2] There is also of course the possibility that Omar might enter a general appearance as it apparently did in the Tax Court when it filed its petition of May 20, 1963, for a redetermination of the deficiencies on the basis of which the present jeopardy assessments were made.

[3] Rule 4 (e), effective July 1, 1963, reads in relevant part:

"Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state, or (2) for service upon or notice

To be sure, this cause of action arose, the complaint was filed, and the temporary injunction was issued before the New York statute became effective. The New York Court of Appeals has, however, indicated that where the suit is instituted *after* the effective date of the statute, the statute will normally apply to transactions occurring *before* the effective date. *Simonson* v. *International Bank,* 14 N. Y. 2d 281, 290, 200 N. E. 2d 427, 432. That court has further indicated that where, as in the instant case, the suit based on the prior transaction was *pending* on the effective date of the statute, "the new act shall—except where it 'would not be feasible or would work injustice'—apply 'to all *further* proceedings' in such actions . . . ." [4] *Ibid.* It seems obvious that a future attempt by the Government to serve process on Omar would be considered a "further proceeding" in the instant litigation. Accordingly, we judge the temporary injunction, which has only a prospective application, as of now and in light of the present remedy which § 302 (a)

to him to appear and respond or defend in an action by reason of the attachment or garnishment or similar seizure of his property located within the state, service may in either case be made under the circumstances and in the manner prescribed in the statute or rule."

Rule 4 (f), also effective July 1, 1963, reads in relevant part:

"All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state."

[4] The Court of Appeals reached these conclusions on the basis of Civil Practice Law and Rules, § 10003, 7B McKinney's Consol. Laws Ann., § 10003: "This act shall apply to all actions hereafter commenced. This act shall also apply to all further proceedings in pending actions, except to the extent that the court determines that application in a particular pending action would not be feasible or would work injustice, in which event the former procedure applies. Proceedings pursuant to law in an action taken prior to the time this act takes effect shall not be rendered ineffectual or impaired by this act."

affords.[5]   And our review of the injunction as an exercise of the equity power granted by 26 U. S. C. § 7402 (a) must be in light of the public interest involved: "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginian R. Co.* v. *Federation,* 300 U. S. 515, 552.   And see *United States* v. *Morgan,* 307 U. S. 183, 194; *Hecht Co.* v. *Bowles,* 321 U. S. 321, 330.

If personal jurisdiction over Omar is acquired, the creditor (the United States) will be able to collect from respondent what the debtor (Omar) could collect. The opportunity to make that collection should not be lost *in limine* merely because the debtor (Omar) has not

---

[5] That the Government has not yet attempted to obtain personal jurisdiction over Omar is not significant in light of the fact that until now the Government's primary contention has been that the District Court's personal jurisdiction over the respondent bank was by itself an adequate basis for the issuance of the temporary injunction.   As the Government said in its petition for rehearing before the Court of Appeals: "The jurisdictional basis, then, for the injunction issued by the District Court was personal jurisdiction over the Bank. Certainly, at this stage of the proceeding, it is inconsequential whether the District Court has jurisdiction over a *res* or over the taxpayer."   The Government went on to say that if this contention was rejected, then it wished to argue that the tax lien had attached to Omar's deposits and that these deposits "constitute rights to property which were within the jurisdiction of the District Court." Finally the Government stated: "It is only in the event that the Court concludes that the lien does not attach to such deposits that personal jurisdiction over Omar becomes relevant.   In such event the Government should be afforded an opportunity to obtain personal jurisdiction over Omar and the injunction should stand pending such efforts."   Even before this Court the Government argues alternatively that "the District Court had authority to enter the temporary injunction to preserve funds over which it had jurisdiction *quasi in rem,*" a contention upon which, as noted previously, we do not pass.

made the agreed-upon demand on respondent at the time and place and in the manner provided in their contract.

Whether the Montevideo branch is a "separate entity," as the Court of Appeals thought, is not germane to the present narrow issue. It is not a separate entity in the sense that it is insulated from respondent's managerial prerogatives. Respondent has actual, practical control over its branches; it is organized under a federal statute, 12 U. S. C. § 24, which authorizes it "To sue and be sued, complain and defend, in any court of law and equity, as fully as natural persons"—as one entity, not branch by branch. The branch bank's affairs are, therefore, as much within the reach of the *in personam* order entered by the District Court as are those of the home office. Once personal jurisdiction of a party is obtained, the District Court has authority to order it to "freeze" property under its control, whether the property be within or without the United States. See *New Jersey* v. *New York City,* 283 U. S. 473, 482.

That is not to say that a federal court in this country should treat all the affairs of a branch bank the same as it would those of the home office. For overseas transactions are often caught in a web of extraterritorial activities and foreign law beyond the ken of our federal courts or their competence. We have, however, no such involvement here, for there is no showing that the mere "freezing" of the Montevideo accounts, pending service on Omar, would violate foreign law, cf. *Societe Internationale* v. *Rogers,* 357 U. S. 197, 211, or place respondent under any risk of double liability. Cf. *Western Union Co.* v. *Pennsylvania,* 368 U. S. 71. The District Court reserved power to enter any protective order of that character. 210 F. Supp. 773, 775. And if, as is argued in dissent, the litigation might in time be embarrassing to United States diplomacy, the District Court remains open

to the Executive Branch, which, it must be remembered, is the moving party in the present proceeding.

The temporary injunction issued by the District Court seems to us to be eminently appropriate to prevent further dissipation of assets. See *United States* v. *Morris & Essex R. Co.*, 135 F. 2d 711, 713–714. If such relief were beyond the authority of the District Court, foreign taxpayers facing jeopardy assessments might either transfer assets abroad or dissipate those in foreign accounts under control of American institutions before personal service on the foreign taxpayer could be made. Such a scheme was underfoot here, the affidavits aver. Unlike *De Beers Mines* v. *United States,* 325 U. S. 212, there is here property which would be "the subject of the provisions of any final decree in the cause." *Id.,* 220. We conclude that this temporary injunction is "a reasonable measure to preserve the status quo" (*Deckert* v. *Independence Shares Corp.*, 311 U. S. 282, 290) pending service of process on Omar and an adjudication of the merits.

*Reversed.*

MR. JUSTICE HARLAN, with whom MR. JUSTICE GOLDBERG joins, dissenting.

The Court's opinion reflects an expansive view of the jurisdiction of a federal court to tie up foreign owned and situated property with which I cannot agree.

The Internal Revenue Service first focused on Omar, S. A., a Uruguayan corporation, in 1959 when Omar filed a return seeking a $10,000 credit from a regulated investment company. Investigation of this relatively small refund claim revealed the possibility that in fact Omar owed a very substantial amount in taxes to the Government. Omar maintained accounts with several New York securities brokers, and purchase and sale orders

communicated from abroad had resulted in the realization of large profits. The lawyer acting for Omar contended that these transactions gave rise to no tax liability because Omar was not a personal holding company. In a meeting with the investigating agent in May 1962, the lawyer warned that if the Service persisted in its attempt to tax Omar as a personal holding company, "Omar would quite likely liquidate its holdings in the United States, and send the money out of the country." [1]

The Service did persist. On October 31, 1962, it issued jeopardy assessments against Omar totaling $19,300,000, and on the same day filed a complaint in the District Court for the Southern District of New York naming as defendants Omar, the brokerage houses with which Omar had dealt, and several banks including the First National City Bank (hereinafter Citibank) which is the respondent here. By this time Omar had in large part succeeded in liquidating its securities and transferring the funds out of the country. Some of the funds were apparently transferred to Citibank's branch in Montevideo, Uruguay, and were on deposit there on the day the complaint was filed. As part of the relief sought, the Government asked the District Court to "freeze" this account (we are not informed as to its size) until such time as personal jurisdiction could be obtained over Omar. Citibank contested the authority of the court to make such an order on the ground that the account had its situs in Montevideo and was therefore beyond the jurisdiction of the court. Personal jurisdiction over Omar had not been obtained at the time the complaint was filed, and has not been obtained in the two years since. Omar is thus not a party to the present litigation. Personal jurisdiction over Citibank was obtained by service upon its home office at 55 Wall Street, New York City.

---

[1] Affidavit of William R. T. Gottlieb, one of the investigating agents.

The issue presented by the case is: Did the Federal District Court have jurisdiction to freeze the account in Montevideo by enjoining Citibank from transferring any property or rights to property held therein for Omar? The Government argues that jurisdiction could stem from either of two sources: jurisdiction *quasi in rem* over the debt owing from Citibank's Montevideo branch to Omar; or personal jurisdiction over Citibank, which is capable of controlling the debt even though its *situs* may be outside the court's jurisdiction. Despite its enigmatic and unsupported statement that "there is here property which would be 'the subject of the provisions of any final decree in the cause,' " *ante*, p. 385, the Court does not decide the *quasi in rem* issue on which the District Court relied. The opinion rests entirely on the personal jurisdiction theory. Both theories are, in my view, demonstrably insufficient.

## I.

### PERSONAL JURISDICTION.

The Court upholds the freeze order on the basis that the District Court, pending acquisition of personal jurisdiction over Omar, had authority to enjoin Citibank (over which it did have personal jurisdiction) from allowing its Montevideo branch to transfer the funds to Omar.

There can be no doubt that the enforcement powers available to the District Court were adequate to accomplish that much of the end in view. Citibank was before the court. It had sufficient control over the Montevideo branch to require compliance with the freeze order, and if it did not exercise that control, the sanctions of contempt could be inflicted on officers and property of Citibank within the New York district.[2] But "jurisdiction" is not

---

[2] Cf. *Penn* v. *Lord Baltimore*, 1 Ves. sen. 444, 454 (Ch. 1750) (1st Am. ed. 1831); *Deschenes* v. *Tallman*, 248 N. Y. 33, 161 N. E. 321.

synonymous with naked power. It is a combination of power and policy. Judge Learned Hand made this point in *Amey* v. *Colebrook Guaranty Sav. Bank,* 92 F. 2d 62, a case containing some of the same elements as the case before us. In reversing so much of an interlocutory decree of a federal judge sitting in Vermont as provided for the cutting of timber in Maine, Judge Hand said:

> "The word, 'jurisdiction,' is in this connection somewhat equivocal; in one sense the judge had it; the bank had personally appeared and was subject to his orders, as far as any corporation can be; he might sequester its property in Vermont, if he could find any, or he might proceed against its officers as for a contempt. But although he thus had the power to prevent the defendant from asserting its rights in Maine, it might still be improper for him to do so. Courts do not always exert themselves to the full, or direct parties to do all that they can effectively compel, and such forbearance is sometimes called lack of 'jurisdiction.' What reserves a court shall make, when dealing with real property beyond its territory, is not altogether plain; as to some things, it will act freely when it has before it those who hold the legal interests." 92 F. 2d, at 63.

The real problem with this phase of the case is therefore this: Granting that the District Court had the naked power to control the Montevideo account by bringing to bear coercive action on Citibank, *ought* the court to have exercised it? Or to put the question in the statutory terms,[3] was the court's order "appropriate" for the enforcement of the internal revenue laws?

---

[3] Internal Revenue Code of 1954, § 7402 (a), provides:

*"To Issue Orders, Processes, and Judgments.*—The district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and

## 1. *Need for Personal Jurisdiction Over Omar.*

We should first consider the question in its starkest form. Assuming that there is no *quasi in rem* jurisdiction over the property (see Part IV, *infra*, p. 404) and no reasonable likelihood of obtaining personal jurisdiction over Omar, why should the court not use its naked power, to the extent that it could be brought to bear on others situated as was Citibank, to tie up Omar's property all over the world for the avowed purpose of coercing Omar into paying its taxes?

Use of judicial equity powers to coerce a party over whom the court has no jurisdiction or likelihood of obtaining jurisdiction is unheard of. The statute authorizing courts to render such decrees as may be "necessary or appropriate for the enforcement of the internal revenue laws" clearly intends that courts use only their *traditional* equity powers to that end.[4] It should not be interpreted as an authorization to employ radically new and extremely far-reaching forms of coercive action in a more freewheeling approach to international than to domestic cases.[5] Neither the Government nor the Court argues for such an extraordinary judicial use of power. Suffice it to say that if the contrary position were taken, serious constitutional problems would arise.

---

orders of injunction, and of *ne exeat republica,* orders appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws."

[4] Compare *De Beers Consol. Mines, Ltd.* v. *United States,* 325 U. S. 212; *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 377.

[5] Compare *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398.

## 2. *Improbability of Obtaining Personal Jurisdiction Over Omar as of the Time the Injunction Was Issued.*

It is basic to traditional notions of equity that to justify the issuance of a protective temporary injunction there must exist a substantial probability that jurisdiction, judgment, and enforcement will be obtained with respect to the person sought to be affected.[6] The Court does not and could not contest this proposition, and virtually concedes that at the time the injunction was issued, the Government had insufficient probability of obtaining personal jurisdiction over Omar to justify the issuance of the freeze order. Section 302 (a) of the New York Civil Practice Law and Rules, upon which the Court alone relies, did not become effective until 10 months later.[7]

No other theory is offered by the Court which could justify the freeze order as of the time at which it was issued.[8]

---

[6] *Hall Signal Co.* v. *General R. Signal Co.,* 153 F. 907; *A. H. Bull Steamship Co.* v. *National Marine Engineers' Beneficial Assn.,* 250 F. 2d 332, 337.

[7] It became effective on September 1, 1963. The freeze order was issued on October 31, 1962. Section 302 provides:

"(a) *Acts which are the basis of jurisdiction.* A court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, as to a cause of action arising from any of the acts enumerated in this section, in the same manner as if he were a domiciliary of the state, if, in person or through an agent, he:

"1. transacts any business within the state; or

"2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

"3. owns, uses or possesses any real property situated within the state.

"(b) *Effect of appearance.* Where personal jurisdiction is based solely upon this section, an appearance does not confer such jurisdiction with respect to causes of action not arising from an act enumerated in this section."

[8] The lame suggestion is made by the Government that Omar would voluntarily make a general appearance to defend the suit. In light of the fact that Omar had quite evidently purposefully with-

### 3. *Evaluating the Injunction "as of now."*

The only course left open to the Court on its theory of the case is to judge the injunction "as of now." Indeed the New York Court of Appeals ruled in *Simonson* v. *International Bank,* 14 N. Y. 2d 281, 200 N. E. 2d 427, that § 302 (a) does not retroactively validate actions in pending cases taken before its enactment, and may be applied to further proceedings in pending cases only if it is equitable to do so.[9] Thus even on the glib assumption that New York courts would interpret § 302 (a) to give personal jurisdiction over one who merely traded long

drawn most of its property from the jurisdiction, including the property here in question, an appearance voluntarily putting this very property in jeopardy would have been most surprising. The Government makes the further argument that Omar might have attempted to make a limited appearance to contest the title to some other property over which the District Court had clear *quasi in rem* jurisdiction (an account with Lehman Bros. in New York has been attached); and since the limited appearance might not be recognized, but instead treated as a general appearance, personal jurisdiction would be obtained. (There is a split of authority as to whether limited appearances are permitted. See *United States* v. *Balanovski,* 236 F. 2d 298 (C. A. 2d Cir.), cert. denied, 352 U. S. 968, and cases cited therein. See also Developments in the Law: State-Court Jurisdiction, 73 Harv. L. Rev. 909, 953 (1960).) Whether or not a rule against limited appearances should prevail in our federal courts, it is clear that no argument for having such a rule could extend so far as to authorize a court, by reason of its having *quasi in rem* jurisdiction over one piece of property, to use whatever naked power is at its command to freeze all property wherever located, which could conceivably be affected by a personal judgment.

[9] *Simonson* involved a suit brought in 1960 in New York against an Arizona bank. The trial court held that there was no personal jurisdiction over the defendant under existing statutes. By the time the plaintiff's appeal on this issue reached the Court of Appeals, § 302 had become effective and appellant tried to rely on it. The court held that § 302 did not retroactively apply to validate the service that had been made upon the Arizona bank, and affirmed the dismissal of the complaint.

distance for his own account on the New York exchanges,[10] the Court must nonetheless show, as a matter of both state and federal law, that there is equity in continuing the existence of the freeze order. There are two inescapable reasons why such a showing is impossible.

(a) The so-called "temporary" freeze order has now been in effect for over two years. During this time no form of jurisdiction over Omar has been obtained. It may be argued that it is this appellate review which has been the cause of delay. *But Omar is not party to this review.* The contesting parties are the Government and Citibank. Nothing pertaining to these proceedings precluded or excused the Government from obtaining personal jurisdiction over Omar and proceeding with the case if it was otherwise able to do so. As far as Omar is concerned, its property has been taken from its control by a court having jurisdiction neither over the corporation nor over the property (see Part IV, *infra,* p. 404), prior to any judgment of liability being entered against it, and during a time when the Uruguayan peso has fallen over 60%.[11] The Government had its chance to reach Omar's property before it was removed from the country. Indeed, it was warned (*supra,* p. 386), and made no legal move until several months later. It made no effort to obtain personal jurisdiction over Omar within a reasonable time after the "temporary" injunction was issued; or after § 302 (a) was enacted; or after the date at which it supposedly altered the theory on which it chose to argue

[10] See *Simonson* v. *International Bank,* 14 N. Y. 2d 281, 288, 200 N. E. 2d 427, 431; *Purdy Co.* v. *Argentina,* 333 F. 2d 95, cert. denied, 379 U. S. 962 (decided under the Illinois statute on which § 302 was patterned). Compare *Grobark* v. *Addo Machine Co.,* 16 Ill. 2d 426, 158 N. E. 2d 73; *Insull* v. *New York World-Telegram Corp.,* 273 F. 2d 166; *National Gas Appliance Corp.* v. *AB Electrolux,* 270 F. 2d 472.

[11] Foreign Exchange Rates, N. Y. Times, Oct. 31, 1962, p. 47, col. 5; N. Y. Times, Jan. 11, 1965, p. 37, col. 4.

its case.  The Court expresses the opinion that this latter event, obviously irrelevant to the equities of Omar and Citibank, somehow explains and excuses the Government's failure to have acquired personal jurisdiction over Omar.  This is surely untenable.  The petition for rehearing was filed on July 10, 1963, following the initial Court of Appeals' opinion and prior to the opinion of the court *en banc*.  Over 18 months have elapsed since that time.  Were this in itself not conclusive, the Government stated unequivocally and as its very first ground for rehearing:

> "The United States, which in this action seeks *inter alia* a judgment *in personam* against Omar, is taking necessary steps to effectuate personal jurisdiction over Omar."

In the face of this statement there is no way that the Court can excuse or avoid the fact that the Government, by reason of either neglect or inability, has failed to acquire jurisdiction over Omar in the ample time which has been available to it.  Yet the Court inexplicably finds equity in continuing the freeze order.[12]  Omar, as a foreign corporation which allegedly withdrew its assets to avoid taxation by this country, naturally does not present a sympathetic aspect to this Court, but that is no justification for perpetuating a "temporary" order which, without any jurisdictional basis, has tied up Omar's

---

[12] The Court's very assertion that the Government changed its theory is belied by the statement, prominently featured in the petition for rehearing, that "The Government contended in the brief heretofore filed in this Court that there is every likelihood that personal jurisdiction over Omar can be effectuated . . . ." Of course, the Government argued alternative theories below just as it has done here.  The statements quoted by the Court (gleaned from a footnote) indicate only that the Government (rightly, I think) regarded the personal jurisdiction argument as its weaker point.

property for over two years.[13]   Alleged tax dodgers, as much as those charged with crime, are entitled to due process treatment.   And the hand of equity should be stayed long before it reaches constitutional limits.

(b) Whether the situation is examined as of the time the order originally issued or as of now, the Government has to show that the funds to be frozen may be subject to ultimate execution.   If the property cannot be subjected to government levy, there is obviously no equity in freezing it.   That is the situation presented here. The *quasi in rem* statute does not permit the court to attach the property directly (see Part IV, *infra,* p. 404), and no view is expressed by the Court as to how or whether this difficulty could be avoided.

The Government argues that this obstacle can be skirted in the following fashion.   Personal jurisdiction under § 302 can be obtained over Omar by mailing a

---

[13] The Government's delay in obtaining personal jurisdiction is particularly significant because of the unknowns and imponderables with which the case in its present posture is saturated.   Thus, we have no firm indication of what Uruguayan law is with respect to any aspect of this action, no indication of the effect freeze orders would have on this country's banking interests, and Omar, the foreign taxpayer whose interests are most at stake, is not before the Court.   Can it be doubted that a decision upon the propriety of the novel use of judicial power here involved could be much better made if the issue were presented in a context with some of the unknowns removed?   Had the Government not delayed but, instead, proceeded (if possible) to acquire personal jurisdiction over Omar, and then judgment and execution (if possible) against the Montevideo account, the case could come before us with most of this opaqueness removed.   Omar could have presented the issue of the validity of the freeze order as a defense to an ultimate levy upon the account; the issue would not be moot at that stage because there would have been no earlier time at which Omar could have attacked the order without running the risk of being subjected to the personal jurisdiction of the court, and, as a matter of sound judicial principle, the Government should not be permitted to levy successfully upon the account when its ability to do so stems from an improper freeze order.

letter to Uruguay pursuant to New York's substituted service statute.[14] Judgment can then be obtained together with an order to Omar to transfer the funds in the Montevideo account to the Government. When Omar refuses to comply voluntarily—it has no officers in New York who could be punished for contempt—a court officer appointed under Rule 70 of the Federal Rules of Civil Procedure could be sent to Montevideo to make demand upon the Citibank branch in the name of the United States.[15] If the branch refuses payment, it will breach its contract to pay on demand. An action for breach of the contract could then be brought by the depositor against Citibank in New York (see n. 27, *infra*). Once that obligation accrues in New York, the Government can garnish it to satisfy the personal judgment. Of course, if the court could directly order Citibank in New York to pay the debt, the obligation would be payable "within the district" (see Part IV, *infra*, p. 404), in which case the *quasi in rem* statute would serve without necessitating elaborate personal jurisdiction theories.

The reasons why this procedural cake-walking should not commend itself are manifest. Foreign courts in cus-

[14] Section 313 of New York Civil Practice Law and Rules provides:

"A person domiciled in the state or subject to the jurisdiction of the courts of the state under section 301 or 302, or his executor or administrator, may be served with the summons without the state, in the same manner as service is made within the state, by any person authorized to make service within the state who is a resident of the state or by any person authorized to make service by the laws of the state, territory, possession or country in which service is made or by any duly qualified attorney, solicitor, barrister, or equivalent in such jurisdiction."

[15] Rule 70 provides in relevant part:

"If a judgment directs a party to execute a conveyance of land or to deliver deeds or other documents or to perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court and the act when so done has like effect as if done by the party."

tomary international practice (which Uruguay presumably follows) do not enforce foreign tax judgments.[16] Therefore Uruguay would undoubtedly not consider valid a demand made by the court-appointed officer for the property within Uruguayan borders. If the refusal to pay the court officer is proper under the Uruguayan law which governs the contract, there can be no breach which would give rise to a cause of action in New York, *Zimmermann* v. *Sutherland*, 274 U. S. 253.

Furthermore the prospect is more than startling that a district court, aware that a foreign country would not enforce its judgment, would nonetheless dispatch a court officer to the foreign jurisdiction to accomplish that end by self-help.[17]

---

[16] *United States* v. *Harden*, [1963] Can. Sup. Ct. 366, 41 D. L. R. 2d 721; *Government of India* v. *Taylor*, [1955] A. C. 491 (H. L.); *Peter Buchanan Ld. & Macharg* v. *McVey*, [1955] A. C. 516 (Eire Sup. Ct.). For enforcement of tax claims between States see *Moore* v. *Mitchell*, 30 F. 2d 600, aff'd on other grounds, 281 U. S. 18; *Colorado* v. *Harbeck*, 232 N. Y. 71, 133 N. E. 357. Contra: *Oklahoma* v. *Rodgers*, 238 Mo. App. 1115, 193 S. W. 2d 919. Tax treaties may be used to change the general international understanding. See Owens, United States Income Tax Treaties: Their Role in Relieving Double Taxation, 17 Rutgers L. Rev. 428, 449–451 (1963). We have no tax treaty with Uruguay, Treaties in Force, 205 (Dept. of State 1964).

[17] Nations, generally chary of having foreign officials enter their borders even for purposes of serving process, are even more unlikely to look with favor upon a foreign official entering in an attempt to enforce a tax judgment. See Smit, International Aspects of Federal Civil Procedure, 61 Col. L. Rev. 1031, 1040 (1961); Harvard Research in International Law, Draft Convention on Judicial Assistance, 33 Am. J. Int'l L., Spec. Supp. II, 43–65 (1939); Jones, International Judicial Assistance: Procedural Chaos and a Program for Reform, 62 Yale L. J. 515, 534–537 (1953); Longley, Serving Process, Subpoenas and Other Documents in Foreign Territory, A. B. A. Section of Int'l and Comp. Law 34 (1959).

The Court derives support for such a bizarre procedure from the fact that "the District Court remains open to the Executive Branch" (*ante*, pp. 384–385). But certainly the Court cannot justify a pro-

## II.

### THE DE BEERS AND DECKERT CASES.

It is surprising that the Court has been content to so cursorily lay aside *De Beers Consolidated Mines, Ltd.* v. *United States,* 325 U. S. 212, for upon examination that case will be found to be indistinguishable from the present case and should control this litigation on the personal jurisdiction issue.

The United States brought a Sherman antitrust action against De Beers and other African-based diamond companies alleging monopolization and conspiracy in restraint of trade. All were allegedly doing business within the United States. With the complaint the Government requested a preliminary injunction freezing all property in the United States belonging to the defendants. As stated in the opinion, the reasons given in support of the motion were:

> " 'The injury to the United States of America from the withdrawal of said deposits, diamonds or other property would be irreparable because sequestration of said property is the only means of enforcing this Court's orders or decree against said foreign corporate defendants. The principal business of said defendants is carried on in foreign countries and they could quickly withdraw their assets from the United States and so prevent enforcement of any order or decree which this Court may render.'
>
> "Amongst other supporting papers was an affidavit by counsel for the United States which stated that 'the investigation which he has made shows the

cedure at odds with proper international practice simply because the Executive has not expressed a contrary wish.

I doubt very much whether before today's decision even our own State Department would have found it easy to lend its aid, by way of issuing a passport or otherwise, to such a novel international adventure.

foreign corporate defendants named herein have endeavored to avoid subjecting themselves to the jurisdiction of the courts of the United States by making their sales abroad only and requiring customers to pay in advance for all purchases.'" 325 U. S., at 215–216.

Under the Sherman Act district courts had power "to prevent and restrain violations of this act" (26 Stat. 209, 15 U. S. C. § 4 (1958 ed.)), and, under the "all-writs" section of the Judicial Code, to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law" (now 28 U. S. C. § 1651 (1958 ed.)). The Court construed these grants of authority as limited to traditional equitable powers. It then demonstrated the remoteness of any levy by the Government against the property of the defendants, and because of the remoteness vacated the freeze order. It should be noted that unlike the present case the property sought to be frozen was within the borders of the United States, and, that without a hold on it, an order to the defendants to stop their alleged monopolistic practices would have been as little likely to meet with voluntary compliance as an order to Omar to pay $19,300,000.

The Government would distinguish *De Beers* on the ground that under the Sherman Act the trial court could award only injunctive relief, whereas in the present case the judgment, were the Government successful, would be a money award. However, the *De Beers* Court recognized that levy against the property could ultimately be had as a means of enforcing the injunctive order. Clearly the Court's point in emphasizing the scope of the order which could issue in the first instance was that the possibility of an ultimate levy was too remote in practical terms to justify freezing the property from the outset of the litigation. Remoteness is the determinative point,

whatever its cause, and in terms of remoteness the case before us argues even stronger than *De Beers* against the issuance of what amounts to an interim sequestration order. The principles of *De Beers* should govern this litigation.[18]

The Government puts forth *Deckert* v. *Independence Shares Corp.*, 311 U. S. 282, instead of *De Beers* as the case most analogous to the present one. In *Deckert* a bill in equity was brought against an insolvent and allegedly fraudulent securities vendor and against a third party who held assets of the vendor. By way of interlocutory relief the plaintiffs asked that the assets in the hands of the third party be frozen, and this Court sustained the request. Distinguishing features are many. *Deckert* involved no international problems. The court had personal jurisdiction over all parties concerned. There was no question of power to enforce a judgment against the frozen funds. The only contingency on which enforcement depended was whether the plaintiff would win the suit; thus, there was virtually no problem of remoteness. And unlike the present case (see *infra*, pp. 404–409), the frozen funds could have been attached directly by a suit *quasi in rem* in a state court.[19]

---

[18] The Court places reliance on *New Jersey* v. *New York City*, 283 U. S. 473, an inapposite case in which the Court enjoined New York City from taking its garbage out to sea and dumping it off the New Jersey coast. No international problem was involved, nor any question of personal jurisdiction, enforcement, or rights of third parties. The garbage left our territorial jurisdiction on a circular route calculated to return it in an offensive manner. The Court had clear jurisdiction to prevent it from beginning that journey.

[19] This last feature was heavily relied upon in *United States* v. *Morris & Essex R. Co.*, 135 F. 2d 711, a tax case in which the tax-lien statute could have been used directly.

Prior to the recent amendments of the Federal Rules of Civil Procedure (see Rule 4 (e)), a federal district court could not obtain *quasi in rem* jurisdiction over a debt owed to an absent defendant. *Big Vein Coal Co.* v. *Read*, 229 U. S. 31.

## III.

### THE OVERALL BALANCE OF EQUITIES AND CONSIDERATIONS AFFECTING JURISDICTION.[20]

Certainly the Court's remark that it must act in light of the "public interest" cannot mean that because the Government is a party here, the Court may ignore its duty to consider the balance of equities. It is, therefore, well to consider just what overall benefits will accrue in the public interest as a result of today's decision.

Except in the context of the comparatively rare case in which the Government has the element of surprise on its side, it must be recognized that the utility of the extraterritorial freeze order as a tax-collecting weapon is minimal. Under the tax regulation adopted during this action the Government declares that it would use the freeze-order power to reach only funds which were transferred out of this country in order to hinder or delay the collection of taxes and which were in banks having an American office.[21] In other words, the regulation would

---

[20] Those policy considerations which enter into a jurisdictional determination once it is decided that naked power exists are those which would apply in the generality of cases raising the jurisdictional question. Those considerations which are peculiar to this case relate to the question whether, in this instance, jurisdiction, once established, should be exercised.

[21] The regulation provides:

26 CFR § 301.6332-1 (as amended by T. D. 6746, 29 Fed. Reg. 9792) *Surrender of property subject to levy.*

"(a) *Requirement*—(1) *In general.* Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the district director, surrender such property or rights (or discharge such obligation) to the district director, except such part of the property or right as is, at the time of such demand, subject to an attachment or execution under any judicial process.

"(2) *Property held by banks.* Notwithstanding subparagraph (1) of this paragraph, if a levy has been made upon property or rights

snare only those taxpayers smart and unscrupulous enough to withdraw their funds from the United States, but stupid and uninformed enough, even after this decision, to put the transferred funds in a bank having a United States office. In order to provide the Government with this toy pistol, the Court flexes its muscles in a manner never before imagined.

If the overall benefits of this exercise of power are minimal, the detriments are substantial.

(a) It would expose Citibank, an innocent stakeholder, to exactly the kind of administrative hazards which New York's "separate entity" theory is designed to obviate.

(b) It would subject Citibank to the possibility of double liability if Uruguay did not recognize the United

---

to property subject to levy which a bank engaged in the banking business in the United States or a possession of the United States is in possession of (or obligated with respect to), the Commissioner shall not enforce the levy with respect to any deposits held in an office of the bank outside the United States or a possession of the United States, unless the notice of levy specifies that the district director intends to reach such deposits. The notice of levy shall not specify that the district director intends to reach such deposits unless the district director believes—

"(i) That the taxpayer is within the jurisdiction of a United States court at the time the levy is made and that the bank is in possession of (or obligated with respect to) deposits of the taxpayer in an office of the bank outside the United States or a possession of the United States; or

"(ii) That the taxpayer is not within the jurisdiction of a United States court at the time the levy is made, that the bank is in possession of (or obligated with respect to) deposits of the taxpayer in an office outside the United States or a possession of the United States, and that such deposits consist, in whole or in part, of funds transferred from the United States or a possession of the United States in order to hinder or delay the collection of a tax imposed by the Code.

"For purposes of this subparagraph, the term 'possession of the United States' includes Guam, the Midway Islands, the Panama Canal Zone, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, and Wake Island."

States' judgment, and multiple liability if Uruguay permitted actions for slander of credit. The District Court's offer to modify the freeze order if Citibank shows that it conflicts with Uruguayan law is some hedge against the first of these dangers, but operating at its best it places the heavy burden on Citibank, blameless in this situation, of discovering Uruguayan law. In practical operation the Uruguayan law may well be unclear to the point that Citibank can only be sure of its obligation to Omar if it is sued for payment and the matter is litigated. If Omar is loath to sue for one reason or another (it may fear that its demand for the money and the bank's refusal to pay it will cause the obligation to become payable in New York), it may be impossible for Citibank to establish Uruguayan law before it is too late. If the Government manages to levy on the account, and only afterwards is it established that the bank was liable to Omar, Citibank would be left to sue the United States for recoupment, an eventuality for which no provision has been made and which the Government stated at the oral argument of this case that it would oppose.

(c) Citibank alleges that its foreign banking business will be hurt because foreign depositors will be discouraged from using United States banks for fear that their funds can be reached by United States courts. There is no sure way to gauge the seriousness of this possibility, but since Citibank is an innocent stakeholder here, doubt should be resolved in its favor.

(d) The Uruguay Code of Civil Procedure provides, in rough translation:

> Art. 511. Judgments rendered in foreign states shall have in the Republic [Uruguay] the effect prescribed by applicable treaties.
> Art. 512. If there are not treaties with the nation in which they are rendered, they shall have the same

effect which by the laws of that nation, it would give to the decrees rendered in the Republic.

Art. 513. If the judgment proceeds from a nation in which by its jurisprudence, it would not give effect to the decrees of the Tribunals of the Republic, they [*sic*] shall have no force here.[22]

When Omar sues Citibank in Montevideo for its account, Citibank will plead the United States decree as a defense, and the Court speculates 'that Uruguay will give it effect (*ante,* pp. 384–385). In light of Uruguay's reciprocity principle the Court's decision implicitly signifies that our courts would recognize a similar order by a Uruguayan court.[23] Operating under a tax regulation similar to that adopted by the Government, a Uruguayan court with jurisdiction over the Montevideo branch of Citibank could freeze accounts in New York.[24] I am extremely reluctant to uphold such a power. The freeze orders of the type in question here issue prior to any court judgment, indeed before any significant proceedings at all. A nation asked to recognize such a freeze order will have virtually nothing to go on but the bare request. The propriety of the decree does not even rest on the reliability of the foreign court, as is the usual case in judgment recognition problems,[25] but on the reliability of the foreign taxing authorities, something a domestic court has no way of judging.

The Court should not lose sight of the fact that our modern notions of substituted service and personal juris-

---

[22] Código de Procedimiento Civil (Couture, 1952). There have been no amendments, Index to Latin American Legislation, Library of Congress.

[23] See Ehrenzweig, Conflict of Laws, §§ 45, 46 (1962); *Hilton* v. *Guyot,* 159 U. S. 113.

[24] The regulation makes no distinction between parent and branch offices.

[25] Reese, The Status in This Country of Judgments Rendered Abroad, 50 Col. L. Rev. 783 (1950).

diction were developed within a framework of States whose various processes are governed by the Due Process Clause and whose judgments must be given full faith and credit by the other States within the federal structure. Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field, both as a basis for asserting federal judicial power with respect to property in foreign countries and for permitting property in this country to be tied up by foreign courts.

## IV.

### Quasi In Rem Jurisdiction.

There remains for consideration the *quasi in rem* issue which the Government argues but which the Court chooses not to decide. Whether the District Court had *quasi in rem* jurisdiction turns on whether Omar had property or rights to property within the Southern District of New York to which a federal lien could attach.[26]

---

[26] 28 U. S. C. § 1655 (1958 ed.) provides:

"§ 1655. *Lien enforcement; absent defendants.*

"In an action in a district court to enforce any lien upon or claim to, or to remove any incumbrance or lien or cloud upon the title to, real or personal property within the district, where any defendant cannot be served within the State, or does not voluntarily appear, the court may order the absent defendant to appear or plead by a day certain.

"Such order shall be served on the absent defendant personally if practicable, wherever found, and also upon the person or persons in possession or charge of such property, if any. Where personal service is not practicable, the order shall be published as the court may direct, not less than once a week for six consecutive weeks.

"If an absent defendant does not appear or plead within the time allowed, the court may proceed as if the absent defendant had been served with process within the State, but any adjudication shall, as regards the absent defendant without appearance, affect only the property which is the subject of the action. When a part of the

Under New York law, Omar had only a conditional right to payment in New York in the event that a demand made upon the Montevideo branch where the account is maintained was wrongfully refused, *Sokoloff* v. *National City Bank,* 250 N. Y. 69, 164 N. E. 745; [27] and two recent decisions by this Court establish that it is New York law which here determines the nature and existence of property rights for federal tax lien purposes.

In *United States* v. *Bess,* 357 U. S. 51, the taxpayer died leaving income taxes unpaid for a prior year. Several life insurance policies were part of his estate. The Court said:

> "We must now decide whether Mr. Bess possessed in his lifetime, within the meaning of § 3670, any 'property' or 'rights to property' in the insurance policies to which the perfected lien for the 1946 taxes might attach. Since § 3670 creates no property

property is within another district, but within the same state, such action may be brought in either district.

"Any defendant not so personally notified may, at any time within one year after final judgment, enter his appearance, and thereupon the court shall set aside the judgment and permit such defendant to plead on payment of such costs as the court deems just."

[27] See *Bluebird Undergarment Corp.* v. *Gomez,* 139 Misc. 742, 249 N. Y. S. 319; *Cronan* v. *Schilling,* 100 N. Y. S. 2d 474, aff'd 282 App. Div. 940, 126 N. Y. S. 2d 192; *Newtown Jackson Co.* v. *Animashaun,* 148 N. Y. S. 2d 66; *McCloskey* v. *Chase Manhattan Bank,* 11 N. Y. 2d 936, 183 N. E. 2d 227; *Zimmerman* v. *Hicks,* 7 F. 2d 443, aff'd *sub nom., Zimmermann* v. *Sutherland,* 274 U. S. 253. And see *Richardson* v. *Richardson* [1927] Prob. 228, 137 L. T. R. (n. s.) 492; Comment, 56 Mich. L. Rev. 90 (1957); Note, 48 Cornell L. Q. 333 (1963).

The bank account is a contract for payment on demand at the Montevideo branch. If demand were wrongfully refused, a cause of action for breach of contract would be created on which Omar could sue in New York. Thus, analytically, it is not the account itself which would become payable in New York, but damages for breach of the contract to pay on demand in Montevideo.

rights but merely attaches consequences, federally defined, to rights created under state law, . . . we must look first to Mr. Bess' right in the policies as defined by state law." 357 U. S., at 55.[28]

Since Bess had had no right to the *proceeds* of the policies during his lifetime, no federal tax lien could have attached to them. But Bess could have drawn on the cash surrender value; thus under state.law he had "rights to property" during his lifetime to that extent. However, it was also true under state law that no creditor was permitted to attach the cash surrender value of the policies. In answer to the contention that the Government should be treated no differently than any other creditor, the Court said:

"[O]nce it has been determined that state law creates sufficient interests in the insured to satisfy the requirements of § 3670, state law is inoperative to prevent the attachment of liens created by federal statutes in favor of the United States." 357 U. S., at 56–57.

On the basis of this analysis—that state law creates property rights, but federal law determines whether liens should attach to them—the Court concluded that the lien could be enforced against the beneficiary of the policies to the extent of the cash surrender value.

Even under *Bess* an argument could be made for permitting a federal lien in this instance to attach in New

---

[28] Section 3670 is now Internal Revenue. Code of 1954, § 6321. It provides:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

York. New York law, which treats branch banks as separate entities and makes Omar's account payable in the first instance only in Montevideo, was developed primarily to meet the problems created by ordinary garnishing creditors, and arguably has no application to a claim by the United States. But the Court, in *Aquilino* v. *United States,* 363 U. S. 509, chose to accept state property law just as it found it, and not to evaluate its underlying rationale in light of the needs of federal revenue collection. There the Government sued a general contractor who had defaulted both on the payment of federal taxes and on the payment of amounts due to subcontractors with mechanics' liens. Money payable by the property owner to the general contractor was the subject of the suit. The subcontractors contended that under New York lien law the general contractor had "mere title" to the contested fund, holding it in trust for the subcontractors; thus, it was argued, he himself had no right to the property within the meaning of the federal lien statute. In remanding the case to determine if the New York law was as the subcontractors contended, the Court indicated it would accept this argument despite the fact that the only practical effect that New York's definition of the general contractor's property rights could have would be to control which creditors prevailed against the property. (See my dissenting opinion, 363 U. S., at 516.) The Court said:

> "The application of state law in ascertaining the taxpayer's property rights and of federal law in reconciling the claims of competing lienors is based both upon logic and sound legal principles. This approach strikes a proper balance between the legitimate and traditional interest which the State has in creating and defining the property interest of its citizens, and the necessity for a uniform administration of the federal revenue statutes." 363 U. S., at 514.

The State of New York has determined that branch banks should be treated as separate entities, primarily in order to avoid the crippling effects which could result from requiring each branch to be aware of and liable to make payments to depositors and garnishing creditors on accounts maintained in other branches.[29] If New York, based upon this policy, has determined that Omar has no immediate right to payment in New York, federal lien law, under *Bess* and *Aquilino,* cannot create one. The rule of those cases would not, I think, go so far as to allow an incidental contract provision adopted by two contracting parties simply for their own convenience to thwart the operation of federal lien law—for instance, an agreement that the parties would meet at a certain place to consummate their transaction—but in the present case the policy determination has been made by the State, not by private parties, and cannot be treated as incidental. The only right to property which New York recognizes in Omar is the conditional right to payment predicated on a wrongful refusal in Montevideo. The Government can, of course, levy on that conditional right, but the satisfaction it will derive from doing so is obviously limited.

The Government seeks to analogize various insurance company cases in which liens are permitted to attach to the cash surrender value of policies despite a contract condition that the policyholder must surrender his policy in order to collect.[30] It is contended that just as federal courts can override the requirement of policy surrender, they can override the requirement of demand and wrongful refusal in Montevideo. The insurance cases, however, are readily distinguishable. The policy

---

[29] See Comment, 56 Mich. L. Rev. 90 (1957).

[30] *E. g., Equitable Life Assurance Society of the United States* v. *United States,* 331 F. 2d 29; *United States* v. *Metropolitan Life Ins. Co.,* 256 F. 2d 17; but see *United States* v. *Metropolitan Life Ins. Co.,* 130 F. 2d 149.

surrender requirement is of the order of an incidental rule of contract between two private contracting parties; indeed, it has been characterized as a housekeeping detail.[31] And if the purpose of requiring surrender of an insurance policy is to protect the company against suit at some later time, a court decree would fully satisfy it. The District Court guaranteed and could guarantee Citibank no such protection from suit by Omar.

In conclusion on the *quasi in rem* branch of this case, it should be remembered that it is a statute which we are interpreting.[32] Section 1655, 28 U. S. C., pertaining to "Lien enforcement; absent defendants," provides for *quasi in rem* jurisdiction in federal district courts over property "within the district." Courts of other countries would recognize that the *situs* of the Omar account was in Montevideo.[33] Courts of New York State would so hold,[34] and where, as here, the common understanding would be that the *situs* of an account payable to a Uruguayan corporation in Montevideo is in Montevideo, we should not indulge a wholly novel interpretation of the governing statute.

## CONCLUSION.

The only case cited by the Court relating to injunctions involving property outside the United States is *New Jersey* v. *New York City,* 283 U. S. 473, in which this Court enjoined New York City from dumping its garbage

---

[31] *Equitable Life Assurance Society of the United States* v. *United States,* 331 F. 2d 29, 33.

[32] *Crane* v. *Commissioner,* 331 U. S. 1. See also *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347, at 356–357.

[33] *Richardson* v. *Richardson,* [1927] Prob. 228, 137 L. T. R. (n. s.) 492.

[34] If the law of Uruguay were known, New York might look to it as a matter of conflicts law.

I would not decide at this juncture whether federal courts in all situations would be required to enforce liens against property which the State would hold to be within its jurisdiction.

in the sea off the coast of New Jersey.[35]   In the face of this slender reed stands *De Beers,* basically indistinguishable from the case at bar, plus the powerful equitable considerations enumerated above.   The clear preponderance of the competing considerations leads to the conclusion that the issuance of this freeze order was not "appropriate for the enforcement of the internal revenue laws" (§ 7402 (a), n. 3, *supra*), and therefore that the District Court, even though it possessed the naked power to act as it did, had no "jurisdiction" (*ibid.*) to issue the challenged order.   The same result follows even if naked power be considered as synonymous with jurisdiction (a proposition which for me is wholly unacceptable) for in that event the action of the District Court must be regarded as entailing an abuse of discretion of such magnitude and mischievous radiations in our general jurisprudence as to make the order a proper subject of review by this Court under its supervisory powers.[36]

While I have the utmost sympathy with the Government's efforts to protect the revenue, I do not think the course it has taken here can be sustained without extending federal court jurisdiction beyond permissible limits.

I vote to affirm the judgment of the Court of Appeals.

---

[35] See n. 18, *supra.*

[36] Under the Court's opinion there appears, even now, to be no limit on the further length of time in which the Government can delay before acquiring personal jurisdiction over Omar.