### UNITED STATES of America, Plaintiff-Appellee,

v.

### COCA–COLA BOTTLING COMPANY OF LOS ANGELES and Arrowhead Puritas Waters, Inc., Defendants,

and

### Aqua Media, Ltd., and A. M. Liquidating Co., Defendants-Appellants.

Nos. 77–2683, 77–2778.

United States Court of Appeals, Ninth Circuit.

March 28, 1978.

Rehearing and Rehearing En Banc Denied May 18, 1978.

Dale E. Fredericks (argued), Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for defendants.

Catherine G. O'Sullivan (argued), of U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before CARTER and GOODWIN, Circuit Judges, and SOLOMON,* District Judge.

JAMES M. CARTER, Circuit Judge:

These are consolidated interlocutory appeals from a preliminary injunction and from an order denying appellants' motion to dissolve the same injunction. The injunction arose in a suit by the United States against both the buyers and the sellers in a corporate acquisition which is alleged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18. The complaint sought divestiture or rescission of the acquisition as alternative remedies. To preserve the possibility of a decree of rescission at the conclusion of trial, the district court, on motion of the government, issued a preliminary injunction maintaining the status quo *pendente lite*. The sellers contend on appeal: (1) the remedy of rescission is not legally available to redress violations of Section 7 of the Clayton Act, and (2) even if legally permissible, rescission is precluded by the particular facts of this case. We *AFFIRM*.

## I. FACTS.

### A. *Background and Parties.*

The buyer-defendants below are Coca-Cola Bottling Company of Los Angeles (CCLA) and its wholly-owned subsidiary, Arrowhead Puritas Waters, Inc. (Arrowhead). The seller-defendants, appellants herein, are A. M. Liquidating Company, a closely held California corporation presently in liquidation, and Aqua Media, Ltd., a California limited partnership. Appellant A. M. Liquidating Company was formerly called Aqua Media, Inc., but when the majority of the assets of Aqua Media, Inc. were sold to

* Honorable Gus J. Solomon, United States District Judge, District of Oregon, sitting by designation.

Arrowhead the corporation changed its name and began liquidation. The limited partnership, Aqua Media, Ltd. was formed at the time of the sale by certain stockholders of Aqua Media, Inc. to purchase and operate the company's remaining manufacturing and service business. For convenience both appellants are sometimes collectively referred to as "Aqua Media".

The defendants in the antitrust suit below are all industrial water service companies engaged in the provision of high purity industrial water services. Numerous categories of industrial and commercial businesses require water from which substantially all the impurities have been removed.[1] This chemically and biologically pure water is obtained either by purchasing it directly from industrial water service companies or by purchasing the purification equipment itself from the same companies.[2]

Aqua Media, Inc. was incorporated in 1967.[3] Its primary line of business was the provision of purified water to industrial and commercial users. Most of its business centered in California, but eventually the company's services expanded into Arizona, New Mexico, Texas and the Pacific Northwest. Certain foreign countries also purchased from the corporation.

In 1972 Aqua Media, Inc. developed a secondary line of business—the manufacture of systems and equipment for industrial water purification. Originally the company considered its two lines of business to be compatible, but by early 1976 its board of directors had determined that the best vehicle for expansion into national and international markets was the provision of systems and equipment rather than provision of the water itself. Because the California market was considered to be finite

the board concluded that Aqua Media, Inc., as then capitalized, did not have sufficient working capital to expand into the national and international markets while at the same time maintaining its California water provision services. It was in this posture that Aqua Media, Inc. received Arrowhead's invitation to enter negotiations for the sale of its California service business and related assets.

### B. *The Acquisition.*

On May 3, 1976, in contemplation of the possible sale of its California service business to Arrowhead, Aqua Media, Inc. adopted a plan of complete liquidation in compliance with the Internal Revenue Code, § 337. The plan, designed to make the eventual sale tax free at the corporate level, was contingent upon the company entering a binding contract of sale with Arrowhead.

Aqua Media, Inc. then negotiated with Arrowhead and on July 20, 1976, the two entered an asset purchase agreement whereby Arrowhead acquired "substantially all of the California industrial water service business assets of Aqua Media." R. 632. The purchase price was $4,750,000, payable $2,750,000 cash on closing and $2,000,000 in promissory notes payable February 28, 1977.

In addition three ancillary agreements were entered: (1) a letter agreement dated July 19, 1976, provided that Arrowhead would provide certain water purification support services for Aqua Media's customers outside California; (2) a distributorship agreement executed August 2, 1976, appointed Arrowhead to be Aqua Media, Inc.'s exclusive distributor for the sale in California of Aqua Media's water purification sys-

---

1. Major customers include hospitals, laboratories, plating companies, aerospace firms, electronics manufacturers, food processors, power utilities/shipping companies, pharmaceutical/cosmetic companies and educational institutions.

2. Many users prefer to purchase the water itself rather than equip and maintain purification systems due, *inter alia*, to the high initial cost of a permanently installed system, the cost and

inconvenience of maintaining a system, the bother of training personnel to operate the system, and the necessity of obtaining emergency service should a company's high purity water purification system break down.

3. Aqua Media, Inc. was originally incorporated under the name "Pacific Pure Water Co." On April 30, 1969 its name was changed to Aqua Media, Inc.

tems and equipment; and (3) a parol agreement on or about August 2, 1976, granted to Arrowhead certain of Aqua Media's customer accounts in Nevada.

The acquisition agreement was closed on August 2, 1976, when Arrowhead paid the $2,750,000 cash and delivered two promissory notes in the aggregate of $2,000,000 payable on February 28, 1977. Aqua Media passed clear title to the assets sold.

On the next day, pursuant to its plan, Aqua Media, Inc. sold its remaining assets[4] to the newly formed limited partnership, Aqua Media, Ltd.[5] Aqua Media, Inc. then changed its name to A. M. Liquidating Company.

The liquidating company proceeded to collect its assets, pay its liabilities and make liquidating distributions to its shareholders. Prior to December 23, 1976, the date on which this action was filed, liquidating distributions of $2,091,000 had been authorized and paid. On December 23, 1976, the company had assets of $2,488,075 subject to liquidated and undisputed liabilities of $240,015 and certain contingent and disputed liabilities. It was then estimated that upon completion of the plan an additional $1,394,000 would be distributable to the shareholders.

### C. *Procedural History.*

The Department of Justice filed its complaint on December 23, 1976, naming both the buyers (CCLA and Arrowhead) and the sellers (A. M. Liquidating Company and Aqua Media, Ltd.) as defendants. The complaint sought divestiture or rescission as alternative remedies "to prevent and restrain the continuing violation by the defendants . . . of Section 7 of the Clayton Act (15 U.S.C. § 18)." Appellants moved alternatively for dismissal, summary judgment or an order striking the prayer for rescission. They contended that Section 7 of the Clayton Act applies only to the conduct of buyers in prohibited acquisitions, not that of sellers. Accordingly they maintained rescission was not an available remedy in Section 7 cases. They also argued that even if rescission was available in proper cases, as a matter of law it is not available in the facts of this case. The motion was denied from the bench.

The government then moved immediately for a temporary restraining order and a preliminary injunction to prevent A. M. Liquidating Company and Aqua Media, Ltd. from further implementing the plan of liquidation by distributing the proceeds of the sale, except for certain payments currently due to bona fide creditors. By stipulated order appellants were temporarily enjoined pending a hearing on the government's motion. On March 14, 1977, after a hearing, the district judge granted the government's motion. He explained:

"In our view the government has sustained its burden of showing substantial likelihood of its success on the merits when the action is tried and, further, that the public interest outweighs the hardships claimed by the Defendants.

"While we concur with the abstract proposition that sellers are not liable under the Clayton Act, we hold that in this case the requested injunction may issue because on the record before us an effective remedial order, if the merger is completed, would be either impossible or severely limited.

"The argument that rescission here is not available is inconclusive, and the Court retains that option.

"A preliminary injunction, in our view, is necessary to maintain the status quo."

---

**4.** These included the remaining water service assets outside California and the manufacturing business assets. The purchase price was $405,000.

**5.** When it approved the sale of assets to Arrowhead, the board of directors of Aqua Media, Inc. also approved a written offer by two members of the company's management team to purchase the remaining assets. The sale of these residual assets was conditioned upon the creation of a limited partnership in which every Aqua Media shareholder would have the right to participate as a limited partner in the same proportion as their voting stock bore to all of the issued and outstanding stock of the corporation.

The preliminary injunction order was filed April 27, 1977, accompanied by extensive findings of fact and conclusions of law.[6] Appellants moved to dissolve the injunction on the same grounds they originally argued. Their motion was denied. From the preliminary injunction and the denial of their motion to dissolve it A. M. Liquidating Company and Aqua Media, Ltd. appeal.

## II. LEGAL AVAILABILITY OF RESCISSION.

We note at the outset that this case is before us in a unique posture. The district judge has not held a trial on the merits and has not decreed any final relief. We are only conducting an interlocutory review of the preliminary injunction. Yet the injunction is forward-looking, preserving the *status quo pendente lite* in contemplation of a potential decree of rescission. Appellants' arguments center not on any immediate harm caused them by the injunction itself, but on the legal and factual availability of the ultimately possible remedy of rescission. Thus our review of the legal issue involved—the availability of rescission in Clayton § 7 cases—is conducted largely in the abstract. And our review of the factual availability of the remedy in this case is significantly restricted by the lack of a well-developed factual background.

The precise issue on appeal is whether the district court based its decision on an erroneous legal premise or abused its discretion in granting the preliminary injunction. *Aguirre v. Chula Vista Sanitary Service and Sani-Tainer, Inc.,* 542 F.2d 779, 780–81 (9 Cir. 1976); *Douglas v. Beneficial Finance Co.,* 469 F.2d 453, 454 (9 Cir. 1972). Aqua Media's central challenge is directed at the district court's legal conclusion that rescission is a permissible remedy in Clayton Act

§ 7 cases. Appellants maintain their conduct is not proscribed by § 7 and that there is no legal authority for an order of rescission against a non-violator of the act. The availability of rescission of an acquisition violative of § 7 of the Clayton Act is a matter of first impression in the federal circuit courts, but our review of the statutory scheme provided by § 7 and § 15 of the Clayton Act, the history of equity jurisdiction in the federal courts, and the treatment of similar claims in the lower courts convinces us that in appropriate cases rescission can be ordered.

In relevant part § 7 of the Clayton Act reads:

"No corporation engaged in commerce *shall acquire,* directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission *shall acquire* the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." (Emphasis added.)

By its express terms § 7 proscribes only the act of acquiring, not selling, when the forbidden effects may occur. Aqua Media is correct in its initial assertion that technically it has not violated the Clayton Act. *See Dailey v. Quality School Plan,* 380 F.2d 484 (5th Cir. 1967); *U. S. v. Parker-Hannifin Corp.,* 1974 Trade Cases ¶ 75,061 (C.D. Cal.1974); *Record Club of America, Inc. v. Capitol Records, Inc.,* 1971 Trade Cases ¶ 73,694 (S.D.N.Y.1971); *In the Matter of Dean Foods, et al.,* 70 F.T.C. 1146 (1966). Nevertheless, the fact that sellers are not violators of § 7 does not force courts to close their eyes to the fact that the sellers

---

**6.** Factually the district judge concluded that rescission might be the only effective remedy if a violation is eventually proven. It was noted that divestiture might be unworkable due to the lack of interested buyers and the high entry barriers in the high purity industrial water service market.

Legally the judge concluded that it was reasonably probable that the government would

prevail at a trial on the merits; that the remedy of rescission of a sale of assets may be ordered in a proceeding under Section 7 of the Clayton Act in order to restore effective market competition; and that economic hardships to the sellers, in the event rescission is found to be the only effective remedy, cannot outweigh the public's interest in meaningful antitrust relief.

are parties to an acquisition which is prohibited by law. Congress recognized that on occasion third parties whose conduct is not specifically addressed by the Clayton Act would be so related to the anti-competitive effects at which the act was directed that their presence would be necessary in order to fashion complete relief. Accordingly, in § 15 of the Clayton Act Congress invoked the equity jurisdiction of the federal courts and provided that when the interest of justice requires, third parties can be joined in proceedings under the act:

"The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of this Act, and it shall be the duty of the several United States attorneys . . . to *institute proceedings in equity to prevent and restrain such violations.* . . . Whenever it shall appear to the court before which any such proceeding may be pending that *the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned* . . ." (Emphasis added.)

■ The equity jurisdiction of the federal courts traditionally has permitted the fashioning of broad and flexible decrees molded to the necessities of the individual case. Particularly, when equity jurisdiction has been invoked to enforce federal statutory prohibitions, the Supreme Court repeatedly has recognized the power of the equity court to mold the necessary decrees to give effect to congressional policy. *See, e. g., United States v. First Nat. City Bank,* 379 U.S. 378, 383, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *J. I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Mitchell v. Robert De Mario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960); *Porter v. Warner Holding Company,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944). In such cases "[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private

interests are involved." *United States v. First Nat. City Bank, supra,* 379 U.S. at 383, 85 S.Ct. at 531, citing with approval *Virginia Railroad Co. v. System Federation No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

*Porter v. Warner Holding Company, supra,* is an instructive example. There the Supreme Court was concerned with the power of a federal court, in an enforcement proceeding under § 205(a) of the Emergency Price Control Act of 1942, to order restitution of rents collected by a landlord in excess of the permissible maximums. The Administrator of the Office of Price Administration had sought restitution, but both the federal district court and the federal circuit court below were unwilling to assume jurisdiction to order the requested relief absent statutory authorization. In a strongly worded reversal the Court explained the inherent equity jurisdiction of the district court:

". . . Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. [Citation omitted.] Power is thereby resident in the District Court, in exercising this jurisdiction, 'to do equity and to mould each decree to the necessities of the particular case.' *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754. It may act so as to adjust and reconcile competing claims and so as to accord full justice to all the real parties in interest; if necessary, persons not originally connected with the litigation may be brought before the court so that their rights in the subject matter may be determined and enforced. In addition, the court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in

that way can equity do complete rather than truncated justice. *Camp v. Boyd,* 229 U.S. 530, 551–552, 33 S.Ct. 785, 57 L.Ed. 1317.

"Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command." *Porter v. Warner Holding Co., supra,* 328 U.S. at 398, 66 S.Ct. at 1089.

Indeed, the necessity of broad equity powers to enforce the antitrust laws has often been declared. When construing § 1 of the Sherman Act and § 3 of the Clayton Act in *International Salt Co., Inc. v. United States,* 332 U.S. 392, 400–01, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947) the Supreme Court stated that the district courts:

". . . are invested with large discretion to model their judgments to fit the exigencies of the particular case. [Citations omitted.] In an equity suit, the end to be served is not punishment of past transgression nor is it merely to end specific illegal practices. A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints. If this decree accomplishes less than that, the Government has won a lawsuit and lost a cause."

And when affirming the power of the district court under § 7 of the Clayton Act to order divestiture, another far-reaching and drastic remedy, the Supreme Court was careful to note the "general consideration" that the "courts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests." *United States v. E. I. du Pont de Nemours & Co., et al.,* 366 U.S. 316, 326, 81 S.Ct. 1243, 1250, 6 L.Ed.2d 318 (1961).

■ The district courts have frequently been faced with the necessity of granting relief against third parties in order to effectively enforce § 7 of the Clayton Act. Consistently they have held that § 15 of the Clayton Act and their general equity jurisdiction authorize relief against such parties if necessary to eliminate the effects of an acquisition offensive to the statute. *See, e. g., United States v. Phillips Petroleum Company,* 367 F.Supp. 1226, 1261–62 (C.D. Cal.1973), *aff'd mem.,* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974); *United States v. Pabst Brewing Company,* 183 F.Supp. 220, 221 (E.D.Wis.1960); *United States v. E. I. du Pont de Nemours & Co.,* 177 F.Supp. 1, 10–12 (N.D.Ill.1959), *reversed on other grounds,* 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961).[7] Several district courts have retained sellers as parties while specifically considering rescission under § 7, but ultimately decreed other forms of relief thought to be more effective. *United States v. Reed Roller Bit Company,* 274 F.Supp. 573 (W.D.Okl.1967); *United States v. Phillips Petroleum Company, supra.*

---

**7.** In the *du Pont* litigation, *supra,* the district court initially dismissed the government's entire complaint. Reversing the Supreme Court seemed to sanction joinder of third parties:

"The motion of the appellees Christiana Securities Company and Delaware Realty and Investment Company for dismissal of the appeal as to them is denied. It seems appropriate that they be retained as parties pending determination by the District Court of the relief to be granted." *United States v. E. I. du Pont de Nemours & Co., et al.,* 353 U.S. 586, 608, 77 S.Ct. 872, 885, 1 L.Ed.2d 1057 (1957).

On remand the district court granted relief against not only the buyer, but also the seller, General Motors, and other related third parties, Christiana and Delaware. The Supreme Court again reversed, on grounds unrelated to the availability of relief against these third parties, but stated:

"General Motors, Christiana and Delaware will thus be able to renew, for the district court's decision in the first instance, any objections they may have to the power of the Court to grant relief against them." *United States v. E. I. du Pont de Nemours & Co., et al.,* 366 U.S. 316, 334–35, 81 S.Ct. 1243, 1255, 6 L.Ed.2d 318 (1961).

This second pronouncement seems to leave as an open question the issue of whether relief can be granted against third parties. Appellants contend this second pronouncement by the Supreme Court implies that sellers cannot be joined as parties in an action under § 7 when the acquisition is consummated. However, the comment is nothing more than a recognition of the issue by the Court. If anything, the Supreme Court's first pronouncement suggests the leaning of the Court.

Based on the foregoing we conclude that rescission is not without the pale of equitable discretion in appropriate circumstances.[8] We are mindful that the equity power of the courts is not unbounded. Each decree must be tested on review to determine whether the district court has abused its discretion or whether the dictates of due process have been infringed. The fact that sellers in § 7 cases are not technical violators of the law is itself a strong equity consideration against rescission. Normally relief should be molded, if possible, which does not adversely affect the interests of nonviolators. Nevertheless, if effective implementation of public policy cannot be decreed without adversely involving third parties, courts in equity may, within limits, involve such parties in the relief to be granted.

Aqua Media seeks to avoid the broad equity power invoked by § 15 of the Clayton Act by construing the section as a limitation on the equity power of the district courts.[9] Section 15 invokes the equity jurisdiction of the district courts to "prevent and restrain" violations of the Clayton Act. Appellants would have us interpret this language to authorize the district court to act against violations only *prior* to the time the acquisition actually occurs. Allegedly, after an illegal acquisition occurs it becomes a "*fait accompli*" and can no longer be "prevented" or "restrained". Thus, Aqua Media concedes the authority of the district court to grant relief against sellers prior to consummation of a disputed acquisition agreement, but contends no authority to fashion relief exists if the buyer and seller are fortunate enough to finalize their purchase sale contract before the acquisition is challenged.

The short answer to appellants' contention is that their reading of § 15 strains the normal meaning of the terms "prevent" and "restrain" far out of perspective. Moreover, as previously noted, the Supreme Court in *Porter v. Warner Holding Company, supra* at 398, 66 S.Ct. 1086, 1089 has precluded us from implying, where not explicit, a statutory restriction of the district court's inherent equity jurisdiction:

". . . the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' *Brown v. Swann,* 10 Pet. 497, 503, 9 L.Ed. 508."

*See also Mitchell v. DeMario Jewelry, supra,* 361 U.S. at 291, 80 S.Ct. 332.

Furthermore, the Supreme Court has given us explicit direction as to the scope of relief affordable under § 15:

". . . The relief which can be afforded under [§ 15] is not limited to the restoration of the *status quo ante.* There is no power to turn back the clock. Rather, the relief must be directed to that which is 'necessary and appropriate in the public interest *to eliminate the effects* of the acquisition offensive to the statute,' *United States v. DuPont & Co.,* 353 U.S.

---

8. We note that the remedy of rescission has been approved, albeit in distinguishable circumstances, by the Supreme Court in *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *Borak* involved a violation of § 14(a) of the Securities Exchange Act of 1934. It resulted in rescission of a merger where the consent of the stockholders was obtained through the use of false and misleading proxy statements. Admittedly this case involves a different statute and arguably involves no nonviolating parties, but its relevance is in showing that the remedy of rescission is an appropriate form of equitable relief. The Supreme Court justified the remedy by resort to the broad equitable powers of the court to effectuate congressional policy. *See* 377 U.S. at 433, 84 S.Ct. 1555.

9. Aqua Media also argues, based on contract law, that rescission cannot be ordered absent assent of the parties. Suffice it to say that this contention is inapposite. The equity power of district courts to fashion effective relief is not constrained by technical doctrines of contract law.

586, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057 (emphasis added), or which will '*cure the ill effects* of the illegal conduct, and *assure the public freedom from* its continuance.' *United States v. United States Gypsum Co.*, 340 U.S. 76, 88, 71 S.Ct. 160, 95 L.Ed. 89 (emphasis added)." *Ford Motor Company v. United States*, 405 U.S. 562, 573, n. 8, 92 S.Ct. 1142, 1149, 31 L.Ed.2d 492 (1972).

Section 7 of the Clayton Act was intended to arrest anticompetitive acquisitions before they work their evil, which may be at or any time after the acquisition. The district court, upon motion of the government, may decree effective relief "at any time that an acquisition may be said with reasonable probability to contain a threat that it may lead to a restraint of commerce or tend to create a monopoly of a line of commerce." *United States v. E. I. du Pont de Nemours & Co., et al.*, 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957).

## III. DISCRETION OF THE DISTRICT COURT TO ENTER THE INJUNCTION.

■ Aqua Media does not explicitly allege that the district court abused its discretion in entering the preliminary injunction preserving the status quo *pendente lite*. However, their argument of the facts throughout their brief and at oral argument can be construed as an allegation that in the circumstances of this case it was an abuse of discretion by the district court to grant the injunction. Aqua Media presents a strong argument that even if rescission is legally available, it is impermissible in the facts of this case. The strongest point in appellants' favor is the fact that over $2 million of the consideration paid for their California water service assets already has been distributed to the shareholders. This is a compelling argument against the decree of rescission which makes it difficult to conceive of how such a decree might be fashioned without impermissibly injuring either Aqua Media or its shareholders.

Again, however, we note the unique posture of this case. We are not reviewing an actual order of rescission by the district court. The court has not yet granted rescission and may never do so. Rather, we are reviewing a preliminary injunction designed to preserve the ultimate availability of rescission in the event it is determined necessary at the conclusion of a trial on the merits. We can reverse the grant of this injunction as an abuse of discretion only if we conclude that under no conceivable circumstances could a final decree involving rescission be permissible. This we cannot do.

■ First, in the event a violation is ultimately proven and rescission is deemed necessary, it does not seem impossible for the district court to devise some way to rescind the acquisition without forcing the undoing of the approximately $2 million distribution already made to Aqua Media's shareholders. If nothing else, the buyers in this transaction—CCLA and Arrowhead—as actual violators of § 7, might be required to give back the illegally acquired assets of Aqua Media without accepting full repayment. It is well established that economic hardship, particularly that of violators of the antitrust laws, can influence choice only as among two or more effective remedies and that the district courts are *required* to decree relief effective to redress antitrust violations "whatever the adverse effect of such decree on private interests." *United States v. du Pont de Nemours & Co., et al.*, 366 U.S. 316, 326–27, 81 S.Ct. 1243, 1250, 6 L.Ed.2d 318 (1961).

■ Second, numerous factors which have not yet been developed at trial may color the availability of relief against Aqua Media. The trial judge specifically noted in his "Findings of Fact and Conclusions of Law" that he has not yet had the benefit of cross-examination and presentation of argument by counsel to develop a complete picture of the transaction in dispute. It is not inconceivable that proof at trial could show Aqua Media to be a culpable party, though not a technical violator of § 7. For example, it may turn out that Aqua Media was fully aware that its sale to Arrowhead

would violate the provisions of § 7. Or proof may show that Aqua Media is now in a strong equitable bargaining position only because it conspired with Arrowhead to make a quick sale and then speeded up its distribution of the proceeds of the sale before the FTC could conduct an investigation and bring suit.[10] If any culpability on Aqua Media's part is proven it would be relevant to the form of relief eventually granted.

 Third, even though the complaint alleges only a violation of § 7 of the Clayton Act, amendment of the complaint is still possible. The complaint should not be dismissed unless "it appears beyond doubt that the [United States] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Further discovery or the proof adduced at trial may expose a violation by Aqua Media of other provisions of the antitrust laws. An acquisition in violation of Clayton § 7 is also potentially a violation of Section 1 or 2 of the Sherman Act or Section 5(a)(1) of the Federal Trade Commission Act. *See* Von Kalinowski, *Antitrust Laws and Trade Regulation* § 15.06. We are not intimating that these acts have been violated or that such violations could be proved against Aqua Media. We simply recognize that proof of what actually occurred is yet to be made. A showing that Aqua Media violated some other antitrust provision is at least a possibility and would not only be relevant to the availability of rescission against it under § 7 of the Clayton Act, but also would be an independent ground for relief.

Precisely because we do not know what trial will show and because we do not know what form of relief the district court will eventually devise, if any, we cannot say that there are no circumstances in this case in which rescission would be permissible.

Finally, we note that Aqua Media has not pursued on appeal its contention in the district court that the preliminary injunction would cause undue hardship. In that regard the district court has permitted A. M. Liquidating Company to distribute its assets to a trustee, satisfying § 337 of the Internal Revenue Code and making the liquidation tax free at the corporate level. And evidence seems sufficient that 1.) the partners of Aqua Media, Ltd. will not be unable to meet their obligations to make capital contributions to the partnership because the liquidation has been suspended, and 2.) Aqua Media, Ltd. will be able to raise sufficient operating capital to pursue its manufacturing business while defending this suit.

## IV. CONCLUSION.

The federal district courts are not precluded as a matter of law from ordering rescission of acquisitions found to be in violation of § 7 of the Clayton Act. Each case must be decided on the basis of the equities of its individual facts. The preliminary injunction issued in this case was within the discretion of the district judge because we cannot say that no form of relief involving rescission is available on the facts of this case and because the interests of the enjoined parties have been adequately protected by the preliminary injunction order. The order of the district court is *AF-FIRMED.*

---

**10.** Within 13 days of reaching the negotiated agreement on July 20, 1976, Aqua Media held an annual shareholder meeting at which the proposals were approved and proceeded to close the agreement with Arrowhead on August 2, 1976.