Howard ROSEN, on behalf of himself and all others similarly situated, Plaintiff–Appellee,

v.

CASCADE INTERNATIONAL, INC., Victor G. Incendy, John T. Sirmans, Jr., Bernard N. Levy, Defendants,

Dr. Lawrence Moses, Defendant–Appellant.

No. 92–4999.

United States Court of Appeals, Eleventh Circuit.

April 11, 1994.

Jeanne Baker, Jane W. Moscowitz, Miami, FL, Barrack, Rodos & Bacine, Daniel E. Bacine, Sheldon L. Albert, Philadelphia, PA, for defendant-appellant.

Steven J. Toll, Daniel Sommers, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, PA, for plaintiff-appellee.

Before TJOFLAT, Chief Judge, DUBINA, Circuit Judge, and RONEY, Senior Circuit Judge.

TJOFLAT, Chief Judge:

This action for money damages, which arises out of a series of allegedly fraudulent securities transactions, is presently pending before the district court. In order to ensure that the plaintiffs would be able to satisfy any money judgment they might ultimately obtain in this litigation, the district court, on the plaintiffs' application for preliminary injunctive relief, froze the assets of one of the defendants. On appeal, that defendant challenges the authority of the district court to enter such an injunction. Because we conclude that the district court had no lawful authority to freeze the defendant's assets pending the outcome of this action, we reverse.

## I.

The plaintiffs in the underlying litigation, and the appellees here, are shareholders of Cascade International, Inc. ("Cascade"), who purchased stock in the company between August 1989 and November 1991. Cascade, a Delaware corporation with its principal place of business in Florida, is a manufacturer and retail seller of various cosmetic and skin care products; the company also operates women's clothing stores from which it sells its cosmetics and imported designer fragrances. Throughout the relevant time period, Victor G. Incendy was the President, Chief Executive Officer, and Chairman of the Board of Cascade; he also owned approximately fifty-one percent of the outstanding voting shares of the company. Lawrence D. Moses, the appellant here, is a Pennsylvania dentist who served as an outside member of the Cascade Board of Directors during the relevant time period. This case involves a series of allegedly fraudulent public statements concerning Cascade's growth and profitability, as well as illegal trading in Cascade stock by corporate officials.[1]

## A.

Throughout 1990 and 1991, Cascade announced steadily increasing earnings, as well as growth in other vital business statistics, in company reports to shareholders, press releases, and filings with federal and state securities-regulating agencies. Moses signed many of Cascade's public filings during the time period here in question, including its annual reports on Securities Exchange Commission Form 10–K for fiscal years 1990 and 1991. The appellees allege that these favorable statements and projections included, among other things, misrepresentations concerning the revenues generated by the company's cosmetics operations and the number of stores the company actually operated. They also contend that Cascade failed to correct earlier reports that it knew would be misleading if left in circulation without amendment to reflect more current information. The appellees conclude that Cascade and its officers therefore concealed adverse facts concerning the company's assets, revenues, and business prospects.

Based upon the information contained in these releases, stock analysts quoted in the *Wall Street Journal* and other financial publications opined during the summer of 1991 that Cascade stock was one of the "hottest bargains around" because the stock was undervalued in light of the company's optimistic growth prospects; a significant and rapid

1. For purposes of this opinion, we accept the appellees' version of events as accurate. Whether these facts demonstrate a likelihood of success on the merits of the underlying litigation is irrelevant to our decision, however, as the issue before us on appeal is simply whether the district court possessed the power to issue the complained-of preliminary injunction. Indeed, this case "concern[s] the threshold question whether the district court has power to enter an injunc-tion even if the plaintiffs can satisfy the ... traditional standards for obtaining such relief, including showing a sufficient probability of success on the merits." *In re Fredeman Litigation*, 843 F.2d 821, 826 (5th Cir.1988). We stress, however, that our description of the facts is not binding on the district court; the actual facts proving or disproving liability will be established at trial.

rise in the price of Cascade's stock resulted.[2] Cascade, through its misrepresentations, thereby maintained an artificially high market price for Cascade stock and induced the appellees to purchase shares at inflated prices.

Moreover, during this same two year period, Incendy, Moses, and certain other individuals affiliated with Cascade allegedly participated in an elaborate scheme to place almost seven million shares of unauthorized Cascade stock into the market. By not disclosing the existence of these shares in the company's annual reports, the appellees allege, the defendants secretly diluted the holdings of Cascade investors and misled potential buyers of Cascade stock about the value of the outstanding shares. In addition, the defendants apparently privately retained the proceeds from the issuance of this unauthorized stock.

In September of 1991, rumors began to circulate in the investment community that Cascade was misleading traders concerning its financial condition and the number of outstanding shares. On October 2, 1991, the *Overpriced Stock Service Newsletter* questioned Cascade's accounting methods and the accuracy of the company's public disclosures. The reaction in the market was immediate and substantial; Cascade's stock price fell from $7¼ on October 1 to $5⅞ on October 2 and continued to decline thereafter.

Public controversy about Cascade continued, and further information about Cascade's financial misrepresentations came to light. On November 20, 1991, Cascade announced that it was unable to locate Incendy (its

CEO) and that its public financial statements for the past two years "may not [have been] accurate." The NASDAQ market system halted trading in Cascade stock at that time. Cascade then filed for bankruptcy protection on December 16, 1991. Also in December, Aaron Karp, Cascade's new interim board chairman, wrote to all Cascade shareholders and revealed the nature of the fraud evidently committed by the company and Incendy.[3] He explained:

> The audited and unaudited financial statements which were issued by the Company for at least the past two fiscal years did not correctly reflect revenues and earnings of the Company or the correct number of shares of common stock outstanding during such periods. It would be pointless to try in this brief letter to explain in detail the manner of these failings. Suffice it so say, they are both numerous and material.

> It appears from our investigations that the issuance of large numbers of shares of common stock of the Company and subsequent transfers of those shares were not authorized by the Board of Directors and violated numerous provisions of the federal securities laws.... Their effect was to inflate what Mr. Incendy reported and the auditor certified as revenues.

In addition, Karp informed the stockholders, "[t]here are fewer retail outlets and cosmetic counters operated by the Company ... than the number portrayed by Mr. Incendy. The cosmetics did not generate the income he depicted."[4] The shareholders' reaction to

**2.** The appellees allege that the price per share of Cascade stock rose from $7⅝ on May 6, 1991, to a high of $11½ on August 8, 1991.

**3.** Moses contends that Cascade and Incendy falsely portrayed Cascade's financial condition and the extent of its retail operations to the company's own outside directors.

**4.** Furthermore, the appellees allege that, in addition to participating in the disclosure of fraudulent financial information about Cascade, Moses also personally engaged in improper transactions involving Cascade stock. Moses resigned from the Cascade board on December 13, 1991, and reported extensive insider trading activities to the SEC the next day. In that report, Moses admitted to engaging in 195 "short swing"

trades in Cascade stock that earned him approximately $3.7 million. Many of the trades were made in the name of PAL Leasing Co., a Moses-owned Pennsylvania corporation. Moses had concealed his relationship to PAL, failing to disclose it in documents filed with federal regulators. Karp referred to this conduct in his December 1991, letter to Cascade shareholders:

> In our investigations, we also found certain persons who, in concert with Mr. Incendy, participated in these illegal stock transactions, possibly without knowledge or intent to violate any laws, but nevertheless in a manner which resulted in a material distortion of the true revenues and earnings of the Company, as well as the number of shares outstanding. Efforts are underway to recover the illegal profits

this series of disclosures by Cascade was immediate: they filed numerous suits to recover damages suffered as a result of the misrepresentations.

### B.

The first suit, a class action based upon the alleged misrepresentations, was filed in the United States District Court for the Southern District of Florida on October 18, 1991. The complaint named Cascade and Incendy as defendants, along with John T. Sirmans (Cascade's Vice President and board Secretary) and Bernard H. Levy (Cascade's auditor). During October and November of 1991, sixteen additional class actions were filed against various individuals affiliated with Cascade; six of these named Moses as a defendant. The district court consolidated all of the class actions relating to Cascade on April 22, 1992.[5]

Because of his alleged role in misrepresenting the financial condition of Cascade to investors, the appellees raise claims against Moses for securities fraud under both federal statutes and state common law. In particular, the appellees allege causes of action under section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1988), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1992), which, taken together, create an implied private right of action for misrepresentations of material facts in the purchase or sale of securities.[6] *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 380 & n. 10, 103 S.Ct. 683, 686 & n. 10, 74 L.Ed.2d 548 (1983). They also contend that Moses is liable under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) (1988), which provides for joint and several liability for "controlling persons" of an institution involved in a violation of the securities laws.[7] Finally, the shareholders assert

gained by such persons. These will be publicly disclosed as the Bankruptcy proceedings unfold over the next several months.

Moreover, Moses was in possession of inside, materially adverse information when he sold his stock to the public; the appellees allege that he failed to disclose that information in violation of his fiduciary duty to the appellees. On February 4, 1992, Cascade commenced an adversary proceeding in the bankruptcy court seeking the disgorgement of all profits Moses had made through his Cascade stock transactions.

5. The court's order provided, in part, that "[a]ll papers previously filed and/or served to date in any of the cases consolidated herein are deemed and adopted as part of the record in the consolidated action." A consolidated amended complaint was ultimately filed on July 7, 1992. Because the consolidated amended complaint was not submitted until after the district court had issued the preliminary injunction at issue in this appeal, however, our inquiry focuses on whether the district court had the authority to issue the preliminary injunction predicated upon the claims raised in the six original complaints that named Moses as a defendant. We note, however, that the essential nature of the claims asserted against Moses did not change in the consolidated amended complaint; therefore, our disposition of this case does not turn on whether we consider the claims raised in the consolidated amended complaint or the causes of action alleged in the original individual class action complaints.

6. Section 10(b) of the 1934 Act outlaws the use, "in connection with the purchase or sale of any security ..., [of] any manipulative or deceptive

device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe...." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Commission pursuant to this grant of authority, provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5 (1992). As this court has explained, "[t]he elements of a Rule 10b–5 cause of action are: (1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Bruschi v. Brown,* 876 F.2d 1526, 1528 (11th Cir.1989).

7. Section 20(a) of the 1934 Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person...." 15 U.S.C. § 78t(a). It is well estab-

causes of action for negligent misrepresentation and fraud under Florida state common law.[8] Each of the six complaints against Moses seeks: (1) the certification of a class of shareholders under Rule 23 of the Federal Rules of Civil Procedure; (2) damages (with interest) suffered as a result of the alleged violations of law; (3) costs and attorneys' fees; and (4) "such other and further relief" as the court deems "just and proper" (phrased variously in the several complaints). None of these complaints requests a permanent injunction as an alternative remedy for any of the stated causes of action.

On May 8, 1992, the appellees filed a motion for a temporary restraining order freezing Moses' assets. Following an ex parte hearing on the application, the district court issued the requested order on May 13. It provided:

> [P]ending hearing on Plaintiffs' motion for a preliminary injunction [to be held on May 21, 1992], defendant Lawrence Moses [is] restrained and enjoined from, directly or indirectly, assigning, bartering, conveying, destroying, encumbering, hypothecating, liquidating, mortgaging, pleading, selling, transferring, or in any other manner disposing of any asset, or any interest in any asset, held by him, or on his behalf, whether under his own name or otherwise, to any person....

The order did allow Moses to withdraw five hundred dollars per month from a designated account for living expenses and provided him the opportunity to apply for additional withdrawals "for reasonable personal or business expenses upon a proper showing of necessity." The temporary restraining order was extended to June 22, 1992, by stipulation of the parties; it also was modified to permit Moses "to expend [up to $32,000 per week] for all normal and reasonable personal and business expenses for purposes consistent with those he has incurred in the past."

Following an evidentiary hearing before a magistrate judge, and after hearing the objections of both parties to the magistrate judge's report, the district court granted a preliminary injunction on June 22, 1992, that incorporated the terms of the temporary restraining order then in force (subject to the posting of a $100,000 bond, which the appellees promptly secured). The district court, relying upon *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945), determined initially that it had the power to grant an injunction to protect a potential monetary judgment. It then found that the appellees had demonstrated both a substantial likelihood of success on the merits of the underlying causes of action and the probability that irreparable harm would result were the preliminary injunctive relief not granted.[9] The court, upon balancing the potential harm likely to befall each party, concluded that "a properly tai-

---

lished that, for a plaintiff to make out a prima facie case that the defendant was a controlling person within the meaning of section 20(a), the plaintiff must show that the defendant both had actual power or influence over the controlled person (the ability to affect management decisions) and induced or participated in the alleged illegal activity. Therefore, "although a corporate director clearly qualifies as a controlling person, specific allegations of the director's participation are required in order to sustain a claim under section 20(a)." Thomas Lee Hazen, *The Law of Securities Regulation* 781–82 (2d ed. 1990).

**8.** In the consolidated amended complaint, the appellees also seek damages from Moses for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 (1988), and for Moses' alleged improper personal trades in Cascade stock, *see supra* note 4. Section 16 of the 1934 Act, 15 U.S.C. § 78p(b) (1988), prohibits corporate insiders, including members of the board of directors, from realiz-

ing "short swing" profits from transactions in the corporation's securities. As we explain above, *see supra* note 4, these claims were not pending at the time the district court issued the preliminary injunction challenged in this appeal.

**9.** As evidence of irreparable harm, the district court's order granting the preliminary injunction cites the November 1991 re-titling of Moses' residences in Pennsylvania and Florida in his wife's name as well as his repeated refusals to settle the case. Moses contends that he simply re-titled the property as a wedding gift to his wife (amending the title to the Pennsylvania residence so that both spouses held the property as tenants by the entireties and transferring the title to the Florida home to his wife outright) several months before he was named as a defendant in this litigation. It should be noted that this real property was not transferred out of reach of the appellees; if the conveyances were fraudulent, numerous remedies at law are available to void the transfers.

**1526**

lored injunction can adequately protect the plaintiffs while inflicting a minimal burden on the defendant." It also explained that "the public's interest in effective enforcement of securities laws and regulations favors enjoining the defendant." Moses appeals from the district court's order granting the preliminary injunction freezing his assets.[10]

## II.

■ This case presents the question whether a district court has the power to enter a preliminary injunction freezing the assets of a defendant before trial in a case where the plaintiffs ultimately seek only money damages. The district court held that, under *De Beers*, a district court has the power to grant an injunction designed to protect such a potential money judgment. For the reasons that follow, we disagree and accordingly vacate the preliminary injunction issued by the district court.[11]

## A.

■ We start with the basic proposition, which ultimately controls this case, that the appellees seek to recover money damages for violations of federal securities laws and state common law. The foregoing discussion of the factual background makes clear that the appellees' claims are legal, not equitable, in nature.[12] For each cause of action asserted against Moses, the appellees seek monetary relief, not an injunction of any sort. Indeed, the federal securities claims against Moses give the appellees causes of action for damages only; the state common law fraud and negligent misrepresentation claims seek only damages as well. In addition, this is not a restitution case or a dispute over a discrete fund or *res* whose ownership is in doubt. Thus, it is not surprising that the appellees concede that a potential award of money damages is all that is at stake.

■ Nonetheless, the appellees' strategy in this case is simply to tie up Moses' assets while the parties litigate the defendants' liability for their alleged fraudulent misrepresentations and illegal stock transactions. Baldly stated, the preliminary injunction requested by the appellees and granted by the district court freezes Moses' assets so that funds will be available with which to satisfy any money judgment that ultimately might be rendered at the conclusion of the litigation. The appellees argue that the district court had general equitable authority to issue the injunction even though the complaints against Moses seek only legal relief in the form of money damages.[13] We now ex-

---

**10.** On July 6, 1992, Moses moved for reconsideration of the preliminary injunction order, contending that the district court had improperly considered evidence relating to offers to compromise. On September 23, 1992, the district court issued an order declining to vacate the preliminary injunction and explaining that it had not, in fact, relied upon the challenged evidence. Moses also appeals this order denying Moses' motion to reconsider or amend the preliminary injunction order.

The courts of appeal have jurisdiction over appeals from "[i]nterlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions...." 28 U.S.C. § 1292(a)(1) (1988). Therefore, the challenged orders of the district court are appealable under section 1292(a)(1). Because both orders raise the same basic issues, we treat them as one (as the parties have done before this court).

**11.** We review a district court's grant of preliminary injunctive relief for abuse of discretion, "but if the court misapplied the law in making its decision we do not defer to its legal analysis." *Guaranty Fin. Serv., Inc. v. Ryan*, 928 F.2d 994, 998 (11th Cir.1991). *See also Tally–Ho, Inc. v.*

*Coast Community College Dist.*, 889 F.2d 1018, 1020 (11th Cir.1989).

**12.** We reject the appellees' suggestion that they successfully invoked the district court's equitable jurisdiction through their requests for any additional relief as may appear "just and proper" at the conclusion of each complaint. The mere incantation of such boilerplate language does not convert a legal cause of action into a legitimate request for equitable relief. As we discuss in the text, the class action complaints contain no allegation that could give rise to a coercive order against Moses. Accordingly, the request for "just and proper" relief cannot be used to sustain the district court's preliminary injunction.

**13.** Since this court "may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below," *Powers v. United States*, 996 F.2d 1121, 1123–24 (11th Cir.1993); *see also United States v. Arthur Young & Co.*, 465 U.S. 805, 814 n. 12, 104 S.Ct. 1495, 1501 n. 12, 79 L.Ed.2d 826 (1984), it is appropriate to address and dismiss an alternative theory: the use of injunctions in aid of a court's jurisdiction.

plain the fundamental errors with which that argument is infected.

### B.

■ It is axiomatic that equitable relief is only available where there is no adequate remedy at law; cases in which the remedy sought is the recovery of money damages do not fall within the jurisdiction of equity.[14] Based upon this fundamental principle of equity jurisprudence, we have explained, " 'the general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment.' " *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir.1994) (quoting *In re Fredeman Litig.*, 843 F.2d 821, 824 (5th Cir.1988)); *accord Home–Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1021 (10th Cir.1990).

In its order granting the preliminary injunction freezing Moses' assets, the district court recognized that the Supreme Court's foundational decision on this issue came in *De Beers,* and held that *"De Beers* does not bar and indeed explicitly permits the injunction sought by the plaintiffs." As we determined in *Mitsubishi,* however, the proper interpretation of the Court's decision is exactly the opposite: *De Beers* explicitly bars

the injunctive relief the district court granted when it froze Moses' assets.

*De Beers* involved a civil antitrust prosecution in which the United States sought, in equity, to restrain the defendants from future violations of the antitrust laws; the government sought no monetary damages for past antitrust violations. Before trial, the government obtained a preliminary injunction freezing all property of the defendants held in the United States to secure payment of any fine for contempt that the district court ultimately might impose on the defendants should they disobey the terms of the court's as yet prospective final order. Accordingly, the procedural posture of the injunction challenged in that case was somewhat unusual.

The Supreme Court invalidated the challenged injunction, holding that the district court's action was not supported by the basic principles of equity.[15] The Court explained that, although "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally, ... [t]he injunction in question is not of this character" because "[i]t is not an injunction in the cause, ... deals with a matter lying wholly outside the issues in the suit," and "deals with property which in no circumstances can be dealt with

---

The All Writs Act, 28 U.S.C. § 1651 (1988), provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The All Writs Act "provide[s] a federal court with various common law equity devices to be used incidental to the authority conferred on the court by rule or statute," but only "with those writs necessary to the preservation or exercise of its subject matter jurisdiction." *ITT Community Dev. Corp. v. Barton,* 569 F.2d 1351, 1359 (5th Cir.1978) (citation omitted). As the Supreme Court has emphasized, "[a]lthough th[e] Act empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Pennsylvania Bureau of Correction v. U.S. Marshals Serv.,* 474 U.S. 34, 43, 106 S.Ct. 355, 361, 88 L.Ed.2d 189 (1985). In this case, the actions taken by the district court are not indispensable to reaching a disposition of the case, and there was no need for the court to protect its jurisdiction. Accordingly, the All Writs Act cannot be

used to justify the challenged preliminary injunction.

**14.** There is no indication in this case that a legal remedy would not be sufficient to vindicate the shareholders' rights since they seek the payment of damages under federal statutes and state common law. Moreover, if any defendant is ultimately held liable, the appellees will have all of the rights of a judgment creditor under Florida law to aid them in collecting upon the judgment. *See* Fed.R.Civ.P. 69.

**15.** The Court also concluded that neither the antitrust laws, under which the action was brought, nor the All Writs Act gave the district court authority to issue preliminary injunctive relief beyond that traditionally exercised by courts of equity. *See De Beers,* 325 U.S. at 218–19, 65 S.Ct. at 1133. Accordingly, the Court focused its attention on whether courts of equity possessed the inherent power to issue preliminary injunctions in order to ensure satisfaction of any money judgment for contempt that might conceivably be issued in the litigation.

in any final injunction that may be entered." 325 U.S. at 220, 65 S.Ct. at 1134. The asset freeze, therefore, was improper because the preliminary injunctive relief was of a different "character" from the final relief sought and obtainable in the litigation (the prohibition of certain conduct, not the payment of money damages). The Court distinguished from the situation before it "cases in which an interlocutory injunction was granted with respect to a fund or property which would have been the subject of the provisions of any final decree in the cause." *Id.* (referring to *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), as an example).

In reaching its decision, the Court in *De Beers* stressed that federal and state courts, when asked to freeze assets with an eye towards the eventual satisfaction of a money judgment, "appear consistently to have refused [such equitable] relief." 325 U.S. at 221, 65 S.Ct. at 1135. In an oft-quoted passage, the Court stressed:

> To sustain the challenged order would create a precedent of sweeping effect. This suit, as we have said, is not to be distinguished from any other suit in equity. What applies to it applies to all such. Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character

ter has been thought justified in the long history of equity jurisprudence.

*Id.* at 222–23, 65 S.Ct. at 1135. Significantly, the Court's language suggests that the case before it was worthy of discussion because the United States was, at least, seeking *equitable* relief in the underlying litigation, albeit an injunction that was not of the same "character" as the preliminary injunction freezing the defendants' assets. It appears to juxtapose that situation against a case seeking money damages in tort or contract in which a preliminary injunction freezing assets is requested; in such a case, the Court's language makes clear, a prejudgment asset freeze, without a doubt, would be beyond the power of the district court.

The former Fifth Circuit adopted this reading of *De Beers* in *ITT Community Dev't Corp. v. Barton,* 569 F.2d 1351 (5th Cir.1978),[16] a case seeking monetary damages in which the plaintiff sought prejudgment garnishment of assets of the defendant located in certain bank accounts and with his attorneys. The attorneys refused to comply with the garnishment order issued by the district court and were held in contempt; the court of appeals reversed, concluding "[i]t is plain to us that the turn-over order cannot be sustained as a proper exercise of the district court's inherent power to perform its duties and to process the pending litigation to a just conclusion." *Id.* at 1361. The court, in reaching its decision, explained that, "[a]lthough the suit in *De Beers* sought equitable relief, we think that the [decision] indicates that its teaching is clearly apposite to actions at law and, in particular, to the instant case." *Id.*

Contrary to this precedent, both the district court and the appellees have chosen instead to adopt a very different reading of *De Beers,* relying on the interpretation in *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186 (3d Cir.1990).[17] Starting from the

---

**16.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**17.** In *Hoxworth,* as in this case, investors brought a class action against a securities firm and its

president, alleging securities fraud and civil RICO violations arising from the purchases and sales of various penny stocks. The district court issued a preliminary injunction freezing the defendants' assets, and the defendants appealed, arguing that the district court lacked the power to issue an injunction encumbering assets designed to protect a potential future damages

language in the Supreme Court's opinion discussed above, the *Hoxworth* court concluded that "the preliminary injunction [in *De Beers*] was inappropriate not because the plaintiff was seeking money damages ... [but] precisely because the plaintiff could *not* recover any money damages." *Id.* at 195. The court then proceeded to suggest that the Court in *De Beers* actually had endorsed preliminary injunctions that encumbered the assets of defendants in damages actions. It explained:

> Legally as well as economically, money is fungible—if a debtor with $100,000 cash in its general coffers owes $10,000 to someone, there is no meaningful distinction among which of those dollars is actually paid to satisfy the debt. Thus, when a plaintiff seeks money damages and the funds encumbered by the preliminary injunction are worth no more than the amount reasonably in controversy, the injunction does involve "a fund or property which could [be] the subject of the provisions of [a] final decree in the cause," rather than "a matter wholly outside the issues in the suit."

*Id.* at 195–96 (alteration in original) (quoting *De Beers*, 325 U.S. at 220, 65 S.Ct. at 1134). *Accord Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52 (1st Cir.1986) (holding, in damages action against electronics manufacturer for cancellation of orders, that "a preliminary injunction designed to freeze the status quo and protect the damages remedy is an appro-

priate form of relief when it is shown that the defendant is likely to be insolvent at the time of judgment").

We recently concluded that the Third Circuit's interpretation tortures the express language of *De Beers* and runs counter to established equitable principles. *See Mitsubishi*, 14 F.3d at 1522 n. 24. In *Mitsubishi*, the plaintiff sought the payment of a debt and damages for fraud arising out of a series of textile transactions. In order to ensure that the plaintiff would be able to satisfy any money judgment ultimately rendered in the litigation, the district court granted a preliminary injunction that imposed a constructive trust upon the defendants' assets, effectively prohibiting their transfer. When the court allowed the defendants to pay their attorneys' fees with the frozen assets, however, the plaintiff appealed. We affirmed the judgment of the district court allowing such payments because we concluded that the court had possessed no lawful authority, under *De Beers* and general principles of equity jurisprudence, to issue the injunction in the first place. *Id.* at 1517–18.[18]

■ Accordingly, we hold that the district court lacked the general equitable authority in this case to freeze Moses' assets pending trial where the shareholder appellees sought only the award of monetary damages—and not equitable relief—for fraud under federal securities laws and state common law.[19]

---

award, even assuming that the usual criteria for obtaining a preliminary injunction had been met. The court of appeals held that such a preliminary injunction would be permissible (although it vacated the instant preliminary injunction as overbroad).

18. Our decision in *Mitsubishi* reached the same conclusion concerning the availability of this type of preliminary injunction as the Fifth Circuit's opinion in *Fredeman*, which involved civil RICO actions for treble damages. *See Mitsubishi*, 14 F.3d at 1522 n. 24. In *Fredeman*, the plaintiffs alleged that the defendants, who were fuel suppliers, systematically had charged them for more fuel than actually had been delivered. Relying upon *De Beers*, the *Fredeman* court vacated a preliminary injunction prohibiting the defendants from transferring their assets, holding that such prejudgment relief was inappropriate because "[t]he plaintiffs seek only treble damages, and the district court based its injunction

solely on the need to protect those damage claims," and because "[t]he plaintiffs do not ultimately seek return of any particular asset or fund that the interim injunction might secure...." *Fredeman*, 843 F.2d at 825.

19. None of the cases upon which the appellees rely can be read to sanction preliminary injunctive relief freezing a defendant's assets where the plaintiff seeks only money damages; in fact, the distinguishing characteristics of those cases confirm the propriety of our holding today. Several of the cases cited by the shareholders concerned litigation over a particular fund or piece of property, or otherwise sought final equitable relief of the same character as the preliminary injunction. They therefore fall within the range of cases for which *De Beers* expressly authorizes the prejudgment restriction of assets.

For example, in *United States v. First Nat'l City Bank*, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365

Perhaps the answers to fundamental questions of judicial authority such as these are being forgotten, but they lie in broad principles of equity jurisprudence that, as we stated in *Mitsubishi*, "are not new to this court or even to this century." 14 F.3d at 1522. We repeat: preliminary injunctive relief freezing a defendant's assets in order to establish a fund with which to satisfy a potential judgment for money damages is simply not an appropriate exercise of a federal district court's authority.

## C.

 Contrary to the appellees' assertion, our holding that a district court is without the power to grant such preliminary injunctive relief does not mean that "a federal court is powerless to protect a potential future damages remedy against a recalcitrant defendant with highly liquid assets, no matter how wrongful its conduct, how bad the injury it caused, or how brazen its attempt to evade judgment by secreting assets." *Hoxworth*, 903 F.2d at 194. On the contrary, Rule 64 of the Federal Rules of Civil Procedure authorizes the prejudgment attachment of property for the benefit of a plaintiff in certain situations and provides the proper vehicle for plaintiffs seeking to restrain a defendant's assets with an eye towards satisfying a potential money judgment.

 Under the circumstances of this case, the remedy sought by the appellees is equivalent to a writ of attachment. As this court has explained, "[w]hen faced with motions appearing to call for an attachment but labelled something else, federal courts ...

look past the terminology to the actual nature of the relief requested." *Mitsubishi*, 14 F.3d at 1521. *See also De Beers*, 325 U.S. at 219, 65 S.Ct. at 1134 (explaining that "it will be well to note exactly what is the substance of the injunction, since the name given to the process is not determinative"). In this case, "the purpose and effect of the injunction is to provide security for performance of a future order which may be entered by the court." *De Beers*, 325 U.S. at 219, 65 S.Ct. at 1134. Accordingly, we conclude that "Rule 64, and not Rule 65 (which governs injunctions generally), provides the standard for evaluating a request for preliminary injunctive relief that is, in reality, no more than a request for prejudgment attachment; Rule 64 thus properly controls our disposition of [this case]." *Mitsubishi*, 14 F.3d at 1521–22.

 Rule 64 makes available to district courts "all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action" and provides that, except as otherwise provided by the Constitution or an applicable federal statute, such remedies "are available under the circumstances and in the manner provided by the law of the state in which the district court is held." The rule expressly lists attachment as one such available remedy, along with "other corresponding or equivalent remedies, however designated." As the Supreme Court has explained, "long-settled federal law provid[es] that in all cases in federal court, ... state law is incorporated to determine the availability of prejudgment remedies for the seizure of person or property to

(1965), the United States sought to foreclose on a tax lien that previously had been placed on the New York bank accounts of a foreign tax debtor; it did not sue the bank for money damages. Therefore, the preliminary injunctive relief (which enjoined the bank from transferring any of the assets it held for the account of the tax debtor) and the ultimate relief sought in the litigation involved the same bank accounts; as the Court explained in concluding that the prejudgment asset freeze was a reasonable measure to preserve the status quo, "[u]nlike *De Beers*, ... there is here property which would be 'the subject of the provisions of any final decree in the cause.'" *Id.* at 385, 85 S.Ct. at 532 (citation omitted).

*See also Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940) (upholding prejudgment asset freeze in case seeking equitable relief, including appointment of receiver to wind up corporation, rescission of contracts, and the return of disputed fund of money); *Productos Carnic, S.A. v. Central Am. Beef & Seafood Trading Co.*, 621 F.2d 683 (5th Cir.1980) (affirming, with modification, temporary injunction restraining movement of beef pending judgment in suit by Nicaraguan company seeking to recover the beef or its value from Florida corporation to which it had been shipped).

secure satisfaction of the judgment ultimately entered." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters Local 70*, 415 U.S. 423, 436 n. 10, 94 S.Ct. 1113, 1123 n. 10, 39 L.Ed.2d 435 (1974).

The appellees do not attempt to invoke, and the district court did not at any time address, Florida attachment law. In actions at law, plaintiffs in Florida possess an adequate, exclusive prejudgment remedy for the sequestration of assets under the attachment statute, Fla.Stat.Ann. § 76.04–.05 (West 1987), provided that they can satisfy the enumerated statutory grounds for relief. Accordingly, the use of injunctive relief as a substitute for the remedy of prejudgment attachment, with its attendant safeguards, is improper. *See Action Electric & Repair, Inc. v. Batelli*, 416 So.2d 888 (Fla. 4th Dist. Ct.App.1982); *Acquafredda v. Messina*, 408 So.2d 828 (Fla. 5th Dist.Ct.App.1982). Indeed, "[i]t is entirely settled by a long and unbroken line of Florida cases that in an action at law for money damages, there is simply no judicial authority for an order requiring the deposit of the amount in controversy into the registry of the court ... or indeed for any restraint upon the use of a defendant's unrestricted assets prior to the entry of judgment." *Konover Realty Assoc., Ltd. v. Mladen*, 511 So.2d 705, 706 (Fla. 3d Dist.Ct.App.1987) (internal citations and footnote omitted); *see also CMR Distrib., Inc. v. Resolution Trust Corp.*, 593 So.2d 593, 594 (Fla. 3d Dist.Ct.App.1992). Bringing an action to recover money damages "does not entitle the claimant to equitable relief simply because the complaint alleges uncertainty of collectibility of a judgment if a fund of money is permitted to be disbursed. The test of the inadequacy of a remedy at law is whether a judgment could be obtained, not whether, once obtained it will be collectible." *St. Lawrence Co. v. Alkow Realty, Inc.*, 453 So.2d 514, 514–15 (Fla. 4th Dist.Ct.App.1984).

Florida courts do not have the authority to issue the type of injunction granted by the district court in this case, and the appellees have not demonstrated that any of the statutory grounds for attachment apply. As a result, we cannot affirm the district court's

order as a writ of attachment issued under Rule 64.

### III.

We hold that a district court lacks the authority to issue a preliminary injunction freezing the assets of a defendant in a case seeking only money damages. Rule 64 commands that the proper pretrial remedy to ensure that a fund will be available with which to satisfy a money judgment, a writ of attachment, is available according to the provisions of the forum state's law. But "[w]here the state attachment statute does not authorize prejudgment attachment in a given case, a district court is not authorized ... to attempt to accomplish the same result by issuing a preliminary injunction." *Mitsubishi*, 14 F.3d at 1522 n. 24.

Accordingly, we VACATE the district court's order of June 22, 1992, which granted a preliminary injunction freezing the appellant's assets pending trial, and REMAND to the district court for proceedings not inconsistent with this opinion.

IT IS SO ORDERED.